## In re GRAND JURY MATTER, Antoni GRONOWICZ, Appellant.

### No. 84–1721.

United States Court of Appeals, Third Circuit.

Argued Jan. 14, 1985.

Argued In Banc May 6, 1985.

Decided June 24, 1985.

Garth and Becker, Circuit Judges, filed concurring opinions.

Hunter, Higginbotham, and Sloviter, Circuit Judges, filed dissenting opinions.

Ramsey Clark (argued), Lawrence W. Schilling, New York City, Burton Caine, Weldon Brewer, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr. (argued), U.S. Atty., Walter S. Batty, Jr., Stephen V. Wehner, Asst. U.S. Attys., Section Chief, Frauds, Paul J. Larkin, Jr., Atty., Dept. of Justice, Philadelphia, Pa., for the U.S.

Gregory M. Harvey, Frank L. Corrado, Philadelphia, Pa., for amici curiae The American Civil Liberties Foundation and the Authors League of America, Inc.; Morgan, Lewis & Bockius and Irwin Karp, Port Chester, N.Y., of counsel.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Antoni Gronowicz, the author of a book called *God's Broker*, appeals from an order of the district court holding him in civil contempt for refusing to comply with an order enforcing a grand jury subpoena *duces tecum*. The district court denied Gronowicz's motion to quash the subpoena insofar as he sought relief with respect to the production of documents, and Gronowicz was ordered to produce the subpoenaed documents within two weeks. Thereafter the order was modified to identify the documents more specifically. Gronowicz refused to obey the modified order, and was directed to show cause why he should not be held in civil contempt. In response Gronowicz asserted essentially the same objections to the subpoena as had been considered and rejected when the court denied the motion to quash. The district court held that Gronowicz was in civil contempt and ordered that he pay a five hundred dollar per day coercive civil fine for each day of further non-compliance. This appeal followed. Payment of the coercive fine was stayed pending appeal. We now affirm.

### I.

Gronowicz's motion, filed pursuant to Fed.R.Crim.P. 17(c), made four objections to enforcement of the subpoena: (1) that it

sought information that was within the protection of the Pennsylvania Shield Law, 42 Pa.Cons.Stat.Ann. § 5942 (Purdon 1982); (2) that it was burdensome, oppressive, and unreasonable; (3) that the information was sought for an improper purpose because the grand jury's investigation was prohibited by the first amendment; and (4) that the state of Gronowicz's health precluded his personal appearance.[1] The district court ruled that Gronowicz did not have to appear at that time. Thus only the production of documents is in issue. The court ruled, further, that the Pennsylvania Shield Law did not provide a basis for withholding the documents, and that in light of the scope of the grand jury investigation the subpoena *duces tecum* was not unduly burdensome or oppressive. On appeal Gronowicz does not challenge these rulings. The district court also ruled, however, that the subpoena was for a proper purpose in that it sought information relevant to an investigation into possible violations of the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343 (1982). Gronowicz challenges that ruling. He contends that this mail fraud investigation of him is outside the authority of the grand jury because it must of necessity inquire into the truth of assertions made by him in *God's Broker*. Such an inquiry, he contends, may not be made by a grand jury because it would violate the press and religion clauses of the first amendment. Gronowicz also contends that, as the author of a book, he is protected by a federal common law privilege from grand jury subpoena of materials relating to the writing of a book.

*God's Broker* was published in New York by Richardson & Snyder. That firm has since withdrawn the book from the market for reasons which will appear hereafter. The dust jacket states that the book portrays "[t]he life of Pope John Paul II as told in his own words and in the reminiscences of cardinals, bishops, and friends." Much of the text purports to be direct quotations from the Pope and other Vati-

can officials. Gronowicz writes in the prologue that the text is derived "from private conversations in Europe and America with Pope John Paul II, Cardinals and other high officials of the Roman Catholic Church, as well as with the cultural and political personages of Poland." Gronowicz further asserts that Cardinal Wyszynski, Primate of Poland, "introduced me to the Pope, acquainted me with Vatican circles, and convinced the Holy Father that he should bypass the Vatican Department of State and grant the private interviews."

Before Richardson & Snyder decided to publish *God's Broker*, Gronowicz obtained a note to the publisher from John Cardinal Krol of Philadelphia commenting favorably on the manuscript. After the book was published and distributed, however, Cardinal Krol withdrew his endorsement, and information came to the publisher suggesting that Gronowicz never interviewed the Pope, and had met him only once or twice as a member of a general audience. Julian Snyder, a partner of Richardson & Snyder, concluded that the book is a fraud insofar as it purports to recount interviews which never took place, and has brought a civil fraud suit against Gronowicz. The publisher has withdrawn the book from distribution. Gronowicz also contracted with Thomas Leonard of Philadelphia for the motion picture rights to the book. The government asserted in its opposition to the motion to quash, and continues to assert on appeal, that the grand jury is investigating whether Richardson & Snyder or Leonard was defrauded by Gronowicz in violation of 18 U.S.C. §§ 1341 and 1343.

## II.

If, as Gronowicz contends, there is a federal common law privilege analogous to the journalists' privilege, that protects an author from compelled disclosure to a grand jury of information concerning the truth of representations of fact made

---

**1.** No fifth amendment contention has been made by Gronowicz at any stage of these pro-

ceedings.

about the contents of a book, that privilege would afford a basis for reversing the contempt order without addressing his first amendment claims. Gronowicz would not be protected by a privilege, such as is afforded by typical press shield laws, merely to conceal the confidential sources of published information when called to testify in proceedings directed against third parties. *Compare Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979); *United States v. Cuthbertson (Cuthbertson I),* 630 F.2d 139 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *United States v. Criden,* 633 F.2d 346, 358–59 (3d Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Cuthbertson (Cuthbertson II),* 651 F.2d 189, 195–96 (3d Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981). Moreover even in investigations into third party conduct, the press privilege recognized in the cited cases is a qualified one, which yields, if the circumstances so require, to the compelling governmental interest in investigation of crime.

No case has been called to our attention in which this court or the Supreme Court has recognized a press privilege to be absolutely free from inquiry into the legality of the reporter's own activities, even those reflected in a publication. Indeed the Supreme Court has expressly rejected that position. It has held that authors may be held accountable for culpable falsehoods, both criminally, *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and civilly, *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). If the author of a culpable falsehood had a common law privilege such as Gronowicz contends for, simply because the alleged falsehood had been published, it would be extremely difficult to hold that author accountable. The Supreme Court has recognized as much, holding in *Herbert v. Lando,* 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979), that a reporter's thoughts, opinions, and conclusions with respect to materials gathered by him were discoverable in a civil action for libel. The limits on civil discovery, according to the court, are to be found in Fed.R.Civ.P. 26(b)(1), not in any doctrine of absolute privilege. *Id.* at 177, 99 S.Ct. at 1649.

■ When a grand jury conducts an investigation into culpable falsehood, or any other subject, the limits of its inquiry in this Circuit are established by the *Schofield* rule. *In re Grand Jury Proceedings (Schofield I),* 486 F.2d 85, 93 (3d Cir.1973); *In re Grand Jury Proceedings (Schofield II),* 507 F.2d 963, 966 (3d Cir.), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975). The *Schofield* rule requires the government to make a showing by affidavit that the subpoenaed items are: "(1) relevant to an investigation, (2) properly within the grand jury's jurisdiction, and (3) not sought primarily for another purpose." *Schofield II,* 507 F.2d at 966. Gronowicz does not challenge the grand jury's jurisdiction or the relevance of the subpoenaed items to the investigation. Gronowicz may prevail under the third prong of the *Schofield* test only if the subpoenaed items are not sought to further a proper grand jury investigation. In light of *Herbert v. Lando,* no reason occurs to us for establishing a privilege in the grand jury context for authors which is broader than the *Schofield* rule. If the grand jury can constitutionally inquire into culpable falsehood by an author, the *Schofield* requirements are met, and no federal common law privilege permits the author to withhold information.

### III.

■ We turn, therefore, to the contention on which Gronowicz places his principal reliance: that the first amendment prohibits a prosecution for fraud whenever the prosecutor must inquire into the truth or

falsity of the contents of a book.[2] If Gronowicz's interpretation of the first amendment were correct, the subpoena would not be enforced because the information sought would not be relevant to a proper grand jury investigation. The grand jury's investigation appears, so far as the record discloses, to be focused upon the truth or falsity of representations made by Gronowicz to Richardson & Snyder, the publisher, and Leonard, the motion picture producer. Since, however, those representations, particularly about the extent of Gronowicz's personal contact with Pope John Paul II, are repeated in the book, the inquiry will of necessity examine the accuracy of its contents.[3]

Conceding that no reported case stands for the proposition that an author may not be prosecuted for misrepresenting the contents of a book, Gronowicz relies on repeated statements by the Supreme Court in other contexts extolling the social utility of free expression. He argues that because free expression holds such an honored place in our pantheon of values, only a compelling governmental interest can justify any limitation on such expression, and the means chosen for protection of that interest may be no more intrusive than is necessary.

That salutary rule is well established as the test for measuring governmental activities having the effect of imposing prior restraints upon the dissemination of truthful information. *E.g., Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Beneficial Corp. v. F.T.C.,* 542 F.2d 611 (3d Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *New Jersey State Lottery Commission v. United States,* 491 F.2d 219 (3d Cir.1974) (*in banc*), *vacated and remanded for determination of mootness,* 420 U.S. 371, 95

S.Ct. 941, 43 L.Ed.2d 260 (1975); *Veterans & Reservists for Peace in Vietnam v. Regional Commissioner of Customs,* 459 F.2d 676 (3d Cir.), *cert. denied,* 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972). But for commercial speech, at least, an ordinance that serves a valid purpose, but also works a prior restraint upon speech, has been upheld. *Pittsburgh Press v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). This case does not involve a classic prior restraint, imposed before dissemination, such as the injunctions against publication considered by the Court in *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Rather, we are dealing with the supposed chilling effect that the mail fraud statute would have upon authors if, after publication, they could be called to account for a conscious falsehood about the contents of a book. Thus the body of case law establishing that prior restraints on expression must be justified by a compelling state interest, and that the restraint can go no further than necessary for protection of that interest, provides at best limited enlightenment for present purposes.

There can be no doubt that post-publication punishment of the dissemination of conscious falsehood is intended to have and does have an inhibiting effect upon speech. The law of civil and criminal libel is intended to have just this effect. But while it is unlikely that the Supreme Court would uphold an injunction against publication of an allegedly libelous book, it has consistently refused to strike down libel laws imposing post-publication sanctions. *E.g., Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47

---

**2.** This case does not require us to consider whether there might be other bases for first amendment claims cognizable at the grand jury stage. *E.g., United States v. Dionisio,* 410 U.S. 1, 12, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973).

**3.** There is no support in the record for the contention of Gronowicz and amici that this investigation is not viewpoint-neutral, and is intended to harass Gronowicz for the beliefs he expressed. Such a situation would raise serious first amendment concerns that are not now before the court.

L.Ed.2d 154 (1976); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). These decisions demonstrate that serious first amendment interests are implicated in the post-publication context, but also recognize that those interests must be balanced against the societal interest in protecting others from the harm of defamation. In the post-publication setting, the accommodation to the first amendment protection of free expression is made by scienter requirements, which in libel cases vary depending on whether the victim is a public figure or the writing concerns issues of public importance. The scienter requirements forbid the enforcement of overbroad statutes that subject an author to sanctions arising from innocent errors of fact, because such sanctions may have a chilling effect on protected speech. But false statements made intentionally receive no first amendment protection in the post-publication sanctioning context.[4]

No distinction having any first amendment significance can be made between libel, civil or criminal, and fraud, civil or criminal. In both libel and fraud, post-publication sanctioning occurs because of a falsehood made with the requisite state of mind. Judge Hunter's distinction, in this respect, between defamation and fraud is simply untenable. Fraud is false speech in the purest sense, an intentional lie made to induce reliance. The scienter requirement under the mail fraud and wire fraud statutes is at least as strict as that held to be the constitutional minimum for libel. *See United States v. Boyer,* 694 F.2d 58 (3d Cir.1982) (specific intent to deceive requirement of 18 U.S.C. § 1341 may be inferred from reckless misstatement); *United States v. Pearlstein,* 576 F.2d 531, 537 (3d Cir.1978) (in prosecution for mail fraud government must prove willful partic-

ipation in fraudulent scheme with knowledge of its falsity); *United States v. Klein,* 515 F.2d 751, 754 (3d Cir.1975) (mail fraud statute requires proof of specific intent to defraud). Since the quantum of proof for convicting Gronowicz of mail fraud is no less than that which would permit post-publication liability for criminal or civil libel, his contention that the first amendment forbids application of the mail fraud statute to an author must be rejected.

Our rejection of Gronowicz's contention that the grand jury investigation is barred by the first amendment is consistent with the case law upholding mail fraud prosecutions against challenges grounded in the religion clauses of the first amendment. In *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), the Court considered a challenge to a conviction of defendants for soliciting funds by mail for a religious organization by misrepresenting defendants' belief that some of them could cure persons with incurable diseases. The Court upheld an instruction that the jury could convict if it found that the defendants did not believe the representations about spiritual healing, but made them for the purpose of obtaining money. *Id.* at 84, 64 S.Ct. at 885. In *United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982), the court applied the teaching of *Ballard* in upholding the mail fraud conviction of defendants who operated a Ponzi scheme in the guise of a church, knowing that their actions were deceitful. *Id.* at 847–48. The purpose of the grand jury's investigation in this case is to determine whether Gronowicz knowingly misstated the contents of his manuscript. If, as *United States v. Ballard* holds, one can be convicted of mail fraud for knowingly misstating a belief in spiritual healing, and as *United States v. Rasheed* holds, one can

---

4. Judge Sloviter's dissent, relying principally on *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), suggests that there should be a first amendment distinction between criminal fraud and libel prosecutions on the one hand and civil fraud and libel actions on the other. *Garrison* itself rejects this sugges-

tion. In that case, the standard for civil libel actions articulated in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), was applied in straightforward fashion to a criminal libel case. The analysis and result in *Garrison* cannot be squared with the distinction Judge Sloviter apparently finds in its dicta.

be convicted for knowingly misstating a belief in the spiritual multiplication of money, a knowing misstatement as to interviews with Pope John Paul II and other members of the hierarchy of the Roman Catholic Church must also be actionable. *See also United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (mail fraud indictment for political corruption will not chill legitimate political associational activities protected by first amendment).

### IV.

Because Gronowicz could constitutionally be prosecuted for misrepresentations about the contents of *God's Broker*, the subpoena *duces tecum* was issued pursuant to a proper grand jury investigation, the order directing him to comply was valid, and the order finding him in civil contempt for disobeying that order will be affirmed.

### GARTH, Circuit Judge, concurring:

The majority opinion concludes that neither a common law nor a first amendment privilege protects Antoni Gronowicz, the target of a grand jury investigation from complying with a valid *subpoena duces tecum*. I concur, especially because my understanding of the majority opinion is that its constitutional holding is limited to answering the precise question: does any first amendment privilege protect the target (Gronowicz) of a grand jury investigation from producing documents sought by a *subpoena duces tecum?*

I write separately to emphasize the precise constitutional holding of the majority opinion because the arguments surrounding Gronowicz's claimed first amendment privilege do not distinguish, as I believe they should have, between the various stages of a potential criminal proceeding, from grand jury investigation to indictment and through prosecution. I have found no authority or reason which would permit, let alone require, granting a first amendment evidentiary privilege to a grand jury target. I would therefore restrict any grand jury privilege which Gronowicz might assert to that provided by the fifth amendment.

Stated simply, my position is that no first amendment privilege may be claimed by a target of the grand jury even when that target is the author of a writing or a book. On the other hand, once an indictment is returned as a result of a grand jury investigation (if one ever is) and once a prosecution is mounted based on such an indictment, then I am persuaded that a first amendment challenge may be asserted to the indictment, the statute on which it is based, and perhaps even to the prosecution of that indictment itself. I do not regard this as a rule of exhaustion, but rather as one of unavailability, since in the context of a grand jury investigation, satisfaction of the *Schofield* requirements ensures that a subpoena does not issue in bad faith. The *Schofield* rule, when met, thus supplies all the initial first amendment protections needed before a grand jury.

Here, of course, I emphasize that we are not called upon to address or consider the merits of a first amendment challenge attacking the validity of an as yet hypothetical indictment, or the statute on which it may be predicated. Nor in this case are we asked to consider the constitutional propriety of an equally hypothetical prosecution. We are merely asked to decide whether a privilege grounded in the first amendment must be honored in the context of a grand jury investigation. The majority opinion cogently explains why no claimed privilege applies in the present case, where the subpoena itself comports with the *Schofield* rule. I need not repeat the majority's analysis. I would only add that when it is remembered that our decision affects the range of evidentiary privileges available to the *target* of a grand jury investigation, the soundness of the majority's holding becomes apparent.

Gronowicz, as the target of a grand jury investigation, has always possessed a personal fifth amendment privilege to refuse

compliance with the instant subpoena.[1] The assertion of a first amendment evidentiary privilege is thus not only unnecessary for someone in Gronowicz's position, but, I believe, it is wholly unavailable before a grand jury.[2] Had this court been asked to decide the availability of some other constitutionally based evidentiary privilege claimed by the target of a grand jury investigation, I have little doubt that it would have concluded that the fifth amendment privilege made assertion of another constitutional privilege redundant. That Gronowicz claims a privilege founded on the first amendment should not change this result.

In light of the Supreme Court's pronounced reluctance to create new evidentiary privileges, *see Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and the broad sweep of legitimate grand jury inquiries, *see United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), Gronowicz, in my opinion, must be remitted to his already extant privilege under the fifth amendment. In the present context of a grand jury investigation seeking document disclosure, any assertion of his first amendment claims is premature.

I deliberately express no opinion as to the constitutional propriety of any indictment that might ultimately issue from the grand jury because, as I have earlier noted, that issue is not before us. I observe, however, that should an indictment issue, the first amendment challenge that Gronowicz has made here, and the arguments supporting that challenge, may more appropriately be raised by him as a direct attack on the constitutionality of the mail fraud statute as applied. Nothing which we have said, either in the majority opinion or in this separate opinion, restricts Gronowicz's first amendment protections in the latter stages of a criminal proceeding. However, no first amendment privilege, nor indeed any privilege other than a fifth amendment privilege, can currently protect Gronowicz from complying with the grand jury's *subpoena duces tecum*.

BECKER, Circuit Judge, concurring:

While I join in Judge Gibbons' opinion, I write separately because I think it important to explain why, when a grand jury investigation focuses on the truth of a book, the government should be held to a stronger showing than the "scant" requirement of *Schofield II*, 507 F.2d 963, 967 (3d Cir.1975). This position is not inconsistent with the views of the majority; nor is it at odds with the holding in this case, for although in my view the government made an inadequate showing in the *Schofield* affidavits relied upon by the district court, Gronowicz has not challenged their sufficiency. Indeed, he has abjured any *Schofield* claim, choosing to rely solely on the

---

**1.** As the majority has noted, Gronowicz has not to this date pleaded a fifth amendment privilege. *See* maj. op., typescript at 4, n. 1.

**2.** Gronowicz's status, as the target of the investigation, distinguishes this case from other cases in which a qualified common-law privilege was accorded third-party witnesses asked to reveal confidential sources. *See United States v. Cuthbertson*, 651 F.2d 189 (3d Cir.) (Cuthbertson II), *cert. denied sub. nom. Cuthbertson v. CBS*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *United States v. Criden*, 633 F.2d 346 (3d Cir. 1980), *cert. denied sub. nom.; Schaffer v. United States*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980) (Cuthbertson I), *cert. denied sub. nom. Cuthbertson v. CBS*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979).

To the extent that Justice Powell's concurring opinion in the Supreme Court's plurality decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) leaves open the possibility that a first amendment privilege might protect a newsman called to testify before a grand jury whose investigation was not undertaken in good faith, *Branzburg* is also inapposite. Here satisfaction of the *Schofield* rule precludes assertion that the investigation is pursued in bad faith. *Branzburg*, it must be pointed out, did not hold that a first amendment privilege was available in a grand jury context even where the party subpoenaed was not the target of the investigation. *A fortiori*, *Branzburg* did not hold that a first amendment privilege was available to a grand jury target, who undeniably retains a fifth amendment privilege.

argument that the first amendment absolutely precludes a grand jury inquiry.

*Schofield I* and *II* set out the minimum requirements that the government must meet to survive a challenge to a grand jury subpoena. These cases also make clear that in certain circumstances a court in its discretion may require additional justification for a subpoena. *Schofield II,* 507 F.2d at 965. The source of the district court's discretion in this regard is its supervisory power over grand jury proceedings, which in turn stems from the grand jury's status as an arm of the court, *see Robert Hawthorne, Inc. v. Director of Internal Revenue,* 406 F.Supp. 1098, 1103 n. 4 (E.D.Pa. 1976) (Becker, J.). It is the responsibility of the court to preserve the grand jury's historic role as a bulwark between the individual and the state. Hence, the federal courts have broad supervisory power to prevent grand jury abuse, including the granting of relief from unreasonable and oppressive grand jury process. *Id.,* at 1115.

The government's *Schofield* affidavit avers that a "representative of the Vatican" stated that Gronowicz had not had two hundred hours of conversation with the Pope, that he had asked for but had been denied a private audience with the Pope, and that he had been admitted one or two times in a group or general audience. This affidavit might satisfy the *Schofield* requirements in an ordinary case. However, in cases which implicate the values so eloquently described in the three dissenting opinions, I doubt that this averment justifies the enforcement of a subpoena *duces tecum.* More precisely, I find it discomfiting that this investigation proceeded on an anonymous tip, notwithstanding its incorporation in a sworn affidavit.[1]

It is difficult, of course, to describe with precision the heightened *Schofield* showing that I would require where core First Amendment interests are implicated by a

grand jury subpoena. Obviously any such jurisprudence would have to develop on a case-by-case basis. I simply wish to note here that when federal district judges are confronted with appropriate motions to quash, limit or enforce grand jury subpoenas, they can, and indeed should, exercise their responsibility to prevent grand jury abuse by insisting that the government invoke the subpoena power only when there is solid foundation for doing so.

The discriminating exercise of supervisory power that I advocate is not tantamount to a First Amendment *privilege* for targets or subjects of grand jury investigations. In this respect, I agree with Judges Gibbons and Garth. I take issue, however, with Judge Garth's statement that "[t]he *Schofield* rule, when met ... supplies all the initial first amendment protections needed before a grand jury," if by this statement Judge Garth means to suggest that First Amendment concerns cannot support a more stringent *Schofield* requirement in particular cases. Indeed, I believe that any such notion is in tension with *Schofield I* and *II,* and with *Branzburg v. Hayes,* 408 U.S. 665, 708, 92 S.Ct. 2646, 33 L.Ed.2d 626, where the Supreme Court noted "we do not expect that courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." Although the investigative powers of a grand jury are very broad, *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1972), I believe it is clear under current law that federal district judges exercising their supervisory power to prevent grand jury abuse can require the government to provide a strong justification for an inquiry before the court unleashes the power of the grand jury in a context where it might chill the exercise of First Amendment rights. In my view, this was an appropriate case for a heightened *Schofield* show-

---

1. The government submitted a third *Schofield* affidavit which the district court accepted for filing but neither read nor relied upon in ruling on the motion to quash the subpoena. This third affidavit contains more detailed informa-

tion than the earlier ones. In particular, it contains an affidavit from Wladyslaw Cardinal Rubin, of the Vatican Secretariat, confirming the substance of the second *Schofield* affidavit.

ing. *Cf. In re San Juan Star Co.*, 662 F.2d 108, 116 (1st Cir.1981) (" 'heightened sensitivity' " for first amendment concerns appropriate in consideration of order prohibiting dissemination to press of communications produced during discovery) (quoting *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 596 (1st Cir. 1980)).

Judge Sloviter has posed some provocative hypothetical situations in which the majority's holding might be thought to undermine important first amendment values. *See* at 1002. I would be concerned about these and other "worst case" scenarios but for my belief that such efforts to suppress the contents of books for improper reasons would constitute grand jury abuse which could be reined by the exercise of the supervisory power I have described. Proper exercise of that power, in my view, requires more than the perfunctory examination of affidavits, and may be exercised in the context of a formal hearing convened to determine whether the prosecutor is acting in bad faith.

HUNTER, Circuit Judge, dissenting:

1. The majority opinion rests on the unsupported assumption that the "grand jury's investigation appears, so far as the record discloses, to be focused upon the truth or falsity of the representations made by Gronowicz to Richardson & Snyder, the publisher, and Leonard, the motion picture producer." It further characterizes the investigation as one in which Gronowicz would be "called to account for a conscious falsehood about the contents of a book." But the majority deletes from its recitation of the case the Government's own concessions that the focus of the grand jury investigation was on the truth or falsity of the book itself.

2. Before the district court, the Assistant U.S. Attorney stated that "Mr. Gronowicz is right that the grand jury is investigating the truth or falsity of the book in the sense that the book purports to represent that he had exclusive access for two hundred hours to Pope John Paul II."

App. at 206. In its modified affidavit, submitted pursuant to the procedures outlined in *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963, 966 (3d Cir.), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), the Government again admits that the information sought in the subpoena is necessary to determine whether "the book accurately portrays any notes of conversations with the individuals in the book to whom the statements are attributed. In addition, they are necessary to determine if Gronowicz's records support his claim that he interviewed the various individuals." App. at 62. Moreover, the majority refuses to acknowledge that in a case such as this, where the fraud consists solely of procuring publication of a book which the Government alleges is untrue, the purpose of the investigation must be to establish the truth of the book itself, and not merely the truth of the representations about the book. If the book is true there can be no fraud. In sum, the Government's purpose for procuring the information sought is clear. It wished to ascertain from Gronowicz the truth of the statements he made in his book.

3. The majority correctly states that a grand jury subpoena must fulfill three requirements in order to be valid. It must be "(1) relevant to an investigation, (2) properly within the grand jury's jurisdiction, and (3) not sought primarily for another purpose." (*Schofield II*), 507 F.2d at 966. We must determine in this appeal, therefore, whether the government issued the subpoena with a "proper purpose" when its aim was to determine whether Gronowicz's book is true or false. Unlike the majority, I do not believe that it did. Under established Supreme Court precedent, the First Amendment protects citizens from government prosecution for false speech. For instance, in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court recognized that "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive,' " 376 U.S. 254, 271–72, 84 S.Ct.

710, 721, 11 L.Ed.2d 686 (1964) (quoting *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) ). And in *N.A.A.C.P. v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963), the Court emphasized that protection by the First Amendment does not depend on "the truth, popularity, or social utility of the ideas or beliefs which are offered." In *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), the Court concluded its discussion of the First Amendment by stating:

> To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

4. It is clear, therefore, that established Supreme Court precedent supports the position that false speech, not alleged to be defamatory, receives protection under the First Amendment. The subpoena in this case, which seeks to reach notes and other supporting data from Gronowicz to prove the book's truth, infringes significantly on the author's first amendment rights. The Government asserts that its interest in enforcing the mail and wire fraud statutes justifies its action. But the Supreme Court has consistently held that official action with adverse impact on first amendment rights must be justified by a governmental interest that is "compelling," "overriding," or "paramount." *N.A.A.C.P. v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405 (1963) ("only a compelling state interest ... can justify limiting First Amendment freedoms."); *Gibson v. Florida Legislative Investigating Committee,* 372 U.S. 539, 546, 83 S.Ct. 889, 893–94, 9 L.Ed.2d 929 (1963) ("[I]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press,

association and petition that the state convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest."); *Bates v. Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960) ("Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling."); *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945) ("Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.").

5. Here the mail and wire fraud alleged by the Government is inextricably meshed with the contents of the book. The Government's admitted purpose is to probe the truth of the book. Since the Government has not set forth an independent compelling interest—other than an interest in preventing the fraud of false statements in the book—I would not enforce the grand jury subpoena in this case.

6. The majority relies on *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), and a number of other civil libel cases as support for its position that the subpoena is valid. But these cases differ fundamentally from the case before us. In *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), for example, the plaintiff instituted a private civil action in diversity for defamation against a television network and two of its employees. The plaintiff conceded that he was a public figure and recognized that he was required to prove that the defendants published damaging falsehoods with knowledge that they were false or in reckless disregard of their truth or falsity. The defendants refused to answer a variety of questions asked in discovery, asserting that the first amendment barred any inquiry into the state of mind of those who edit, produce or publish news stories, and into the editorial process. The Supreme Court rejected the claim of first amendment privilege. The Court reiterated its holding in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that the

First Amendment did not prohibit a defamation action by a public figure where the plaintiff can prove knowing falsity or reckless disregard for truth or falsity. The Court then went on to hold that it could not "erect an impenetrable barrier" to the plaintiff's ability to prove its case by protecting defendants from inquiry into their editorial processes. *Herbert*, 441 U.S. at 170, 99 S.Ct. at 1647.

7. The majority's reliance on *Herbert* is misplaced. That case resembles this one in that the investigation was aimed at discovering the truth or falsity of published material and the state of mind of the author. But the investigation in *Herbert* was instituted by a private party, allegedly defamed by the publication, rather than by the government, as in our case. No one can fail to discern the significance of the distinction. The First Amendment primarily protects citizens from *government* intrusion into their freedom of expression, and not against private efforts to gain vindication by civil actions.

8. Similarly, the majority's citation to *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), fails to provide any convincing support for its position. The Court held there that the Government may not inquire into the truth or validity of any particular religious belief, relying exclusively on the Free Exercise Clause of the First Amendment. As the opinion reveals, the defendants in that case did not even mount a challenge to the prosecution based on the Free Speech Clause. *Ballard* cannot, therefore, legitimately be relied on for the proposition that an author, forced by the Government to prove the truth of a book, has no recourse to the Free Speech Clause of the First Amendment.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

Lurking behind today's decision are the spectres of two quite distinct threats to freedom of the press. First, there is the prospect that criminal investigations predicated on the truth or falsity of the contents of nonfiction works dealing with important political and religious issues will so add to the risks inherent in publishing such works that fewer will be published, thus chilling the flow of information and ideas most central to the first amendment. For the reasons given in Part I of this opinion, I conclude with some regret that under prevailing first amendment doctrine this threat cannot be deemed to outweigh the government's legitimate interest in investigating and prosecuting fraud. There is, however, another threat to freedom of the press posed by the investigatory *procedure* this court sanctions today—the prospect that compelled disclosure of records, notes, and unpublished information compiled in the course of preparing a work of nonfiction will so inhibit the gathering and recording of facts and intrude upon editorial processes as to chill protected speech. In previous cases this court has developed a formula for accommodating the sometimes competing interests of the criminal justice system and the media. In this case the government has failed to show that it cannot develop the information it needs without exploring the author's notes and records. For the reasons stated in Part II below, I believe that such an unnecessarily intrusive procedure is impermissible under our established formula and that the judgment of contempt must be reversed. I therefore respectfully dissent.

I.

The difficult issues presented by this case call for especially rigorous first amendment analysis. This, in turn, requires that we first dispense with a number of red herrings that have obscured the true nature of the underlying dispute. First and foremost is the suggestion that this investigation has nothing to do with the contents of *God's Broker*. The book portrays numerous conversations between appellant and Pope John Paul II, often quoting the Pope's words at length. One can readily surmise that this purportedly unprecedented access to the Pope and that these exclusive, in some cases sensational,

quotes were material elements in the sale of the publication and movie rights. The government's purpose is apparent on the face of the subpoena at issue, from the supporting *Schofield* affidavits,[1] and from its briefs and arguments before the district court and this court—it seeks to ascertain whether the meetings portrayed in *God's Broker* in fact took place, and whether the quotes reported therein are in fact the Pope's "own words". The ultimate inquiry in this case will be whether appellant was accurate in portraying what the Pope said to him.

Thus, the modified document request seeks "[a]ny and all notes, recordings (mechanical or otherwise), or other record, made by any means, containing, verbatim or in substance, the statements of Pope John Paul II ... *as contained in the book*." (Emphasis added.) The second *Schofield* affidavit explains:

"These documents are necessary *to determine if the book accurately portrays any notes of conversations with the individuals in the book* to whom the statements are attributed." (Emphasis added.) The government seeks appellant's travel records "to determine if records exist showing that Gronowicz actually made the various trips to Poland, the Vatican, and other places *which he claims to have visited in the book*." (Emphasis added.) Similarly, appellant's passports are sought to determine whether they "show the travel which would be necessary for him to write the book as it is written." His appointment books are sought "to determine if documentary evidence exists of various meetings which led to the attributions and statements *made in the book*." (Emphasis added.)

I think it is beyond peradventure that this is an investigation into the truthfulness of the contents of *God's Broker*. As I explain below, I do not find that fact dispositive. Yet I think we give appellant's first amendment contentions grievously short shrift if our analysis pretends that this investigation does not implicate the contents of published speech, but rather goes to, as the majority would have it, "misrepresentations about the contents" of published speech.

In a related vein, we must reject the government's contention that this is a "commercial speech" case, much like an investigation of a fraudulent securities or real estate prospectus. *God's Broker* is clearly a book addressing important social and political issues and is therefore, in the main, "core" first amendment speech. The fact that appellant sought to profit by its sale is of no consequence. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 265–66, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964).

On the other hand, there is clearly no merit in appellant's contention that the subpoena is an "impermissible shifting of the burden of proof in a speech-related area." *See Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Appellant is not now asked to "prove" anything. It is the government that must first prove to the grand jury that there is probable cause for indicting, and must ultimately prove all the elements of mail fraud beyond a reasonable doubt. And finally, we may put to one side the suggestion of appellant and amici that the government is attempting to bring a prosecution for seditious libel under the guise of mail fraud. The essence of seditious libel prosecutions—which I agree are impermissible under the first amendment—is the punishment of viewpoints, and, in particular, criticism of the government.[2] Indeed, I would readily agree that the first amendment prohibits

---

1. *See In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85 (3d Cir.1973); *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963 (3d Cir.), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975).

2. The Sedition Act of 1798, ch. 74, 1 Stat. 596 (1845)—the *bete noire* of appellant's brief—punished "false, scandalous and malicious writing or writings against the government of the United States...." There is "broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. at 276, 84 S.Ct. at 724.

prosecutions based on the "falsity" of *any* ideas, opinions, viewpoints, or beliefs.[3] Thus, if we were to accept amici's characterization of this investigation as an attempt by the government to side with certain Vatican officials in a dispute over Catholic Church doctrine, the first amendment implications (under the Establishment Clause as well as the Free Speech and Free Press Clauses) would be manifest. I do not, however, see anything in the record that would indicate that this investigation is not viewpoint-neutral. At this stage we must, I think, accept the government's representation that they are evenhandedly investigating possible false statements of fact (*contained in the book*) that may have induced certain entrepreneurs to part untimely with their venture capital. As the many opinions in the recent case of *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (in banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), indicate, the distinction between facts and viewpoints is a problematic one. Were I writing first amendment law from scratch, I would probably avoid such a distinction. Nonetheless, the distinction has been "elevated to constitutional principle," *Ollman v. Evans*, 750 F.2d at 975, and we cannot disregard it. In this case I think it is clear that statements of fact—and not the viewpoints of appellant or the Pope—are the focus of the investigation.

Thus, as I see it, the narrow question before us is to what extent the first amendment protects citizens from a viewpoint-neutral prosecution for making false statements of fact in a nonfiction work dealing with important political and religious issues. I believe that under prevailing first amendment doctrine that protection is quite limited, a recognition of the chilling effect that prosecution may have on truthful speech, rather than a recognition of any first amendment value in falsehoods. "Spreading false information in and of it-

self carries no First Amendment credentials." *Herbert v. Lando*, 441 U.S. 153, 171, 99 S.Ct. 1635, 1646, 60 L.Ed.2d 115 (1979). Justice Powell, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), summed up what I understand to be the prevailing view:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. *But there is no constitutional value in false statements of fact.* Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide open" debate on public issues....
>
> Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate.... And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.... The First Amendment requires that we protect some falsehood in order to protect speech that matters.

418 U.S. at 339–41, 94 S.Ct. at 3006–07 (emphasis added) (footnotes omitted).

As a result of this line of analysis, libelous statements made in the media receive a measure of protection, not because of their intrinsic first amendment value, but as a prophylactic measure, to "eliminate the risk of undue self-censorship and the suppression of truthful material." *Herbert v. Lando*, 441 U.S. at 172, 99 S.Ct. at 1646. *See generally* F. Schauer, *Free Speech: A Philosophical Enquiry* 168–173 (1982). Only libelous statements that are *nonculpable* are protected in all contexts. Statements libeling private figures receive no first amendment protection if negligently made, *even in the context of discussion of*

---

**3.** I believe, as Justice Douglas wrote, that "matters of belief, ideology, religious practices, social philosophy, and the like are beyond the pale and of no rightful concern of government, unless the belief or the speech, or other expres-

sion, has been translated into action." *Branzburg v. Hayes*, 408 U.S. 665, 715, 92 S.Ct. 2646, 2688, 33 L.Ed.2d 626 (1972) (dissenting opinion).

*important public issues. Compare Gertz v. Robert Welch, Inc.,* 418 U.S. at 346, 94 S.Ct. at 3010, *with Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion). Libelous statements regarding public officials and "public figures" receive the *highest* degree of first amendment protection, and even they can be actionable if made with "malice"—*i.e.,* knowingly or recklessly. *New York Times Co. v. Sullivan, supra.* Thus, unless fraud is to be treated differently from libel under the first amendment—and I see no readily apparent reason why it should, since it is also "speech" containing false statements of fact that cause palpable harm—it should not in any context (even, as here, in a book on important issues of public interest) be protected when knowing or reckless. It does indeed appear that under the fraud statutes the government must prove that the falsehoods were knowingly or recklessly made. *See United States v. Sturm,* 671 F.2d 749 (3d Cir.), *cert. denied,* 459 U.S. 842, 103 S.Ct. 95, 74 L.Ed.2d 86 (1982); *United States v. Boyer,* 694 F.2d 58 (3d Cir.1982).

Appellant concedes that he may be subject to civil liability for fraud, but argues that the first amendment does not permit such nice distinctions in the context of criminal prosecutions. I am sympathetic to this view. The consequences, and hence the coercive potential, of criminal prosecutions are profoundly more onerous than those of civil actions.[4] In this context, I find it more difficult to indulge the assumption that punishment of knowing or reckless falsehood will not deter truthful speech. Nonetheless, I think that under current first amendment doctrine "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." *New York Times Co. v. Sullivan,* 376 U.S. at 265, 84 S.Ct. at 718. Protected speech may not give rise to criminal *or* civil liability absent a compelling interest, but unprotected speech may give rise to either. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), a *criminal* libel case, the Court continued to hold that the "knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection," 379 U.S. at 75, 85 S.Ct. at 216, and seemingly concluded that criminal libel prosecutions are permissible, subject only to the malice standard of *New York Times. See also Herbert v. Lando,* 441 U.S. at 156 n. 1, 99 S.Ct. at 1639 n. 1. More recently, the Court has stated:

> The prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish. Although it may deter or regulate what is said or published, the press may not circulate knowing or reckless falsehoods damaging to private reputation without subjecting itself to liability for damages,

---

**4.** *But see New York Times Co. v. Sullivan,* 376 U.S. at 277–78, 84 S.Ct. at 724–25 (footnote omitted):

> The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute.... Alabama, for example, has a criminal libel law which subjects to prosecution "any person who speaks, writes, or prints of and concerning another any accusation falsely and maliciously importing the commission by such person of a felony, or any other indictable offense involving moral turpitude," and which allows as punishment upon conviction a fine not exceeding $500 and a prison sentence of six months.... Presumably a person charged with violation of this statute enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt. These safeguards are not available to the defendant in a civil action. The judgment awarded in this case—without the need for any proof of actual pecuniary loss—was one thousand times greater than the maximum fine provided by the Alabama criminal statute, and one hundred times greater than that provided by the Sedition Act. And since there is no double-jeopardy limitation applicable to civil lawsuits, this is not the only judgment that may be awarded against petitioners for the same publication.

I would also note that the record indicates that publication of appellant's biography of Greta Garbo has been delayed many years by the threat of a lawsuit by Miss Garbo.

including punitive damages, or *even criminal prosecution.*

Branzburg v. Hayes, 408 U.S. 665, 683, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972) (emphasis added). Again, unless fraud is different in some significant way from libel, the first amendment would not seem to prohibit a criminal prosecution.

I find the first amendment theory espoused in the dissents of Judge Hunter and Judge Sloviter an attractive one, and were we writing on a clean slate I would wholeheartedly endorse it. I have no doubt that investigations such as this one contribute incrementally to a climate that discourages the publication of books on controversial topics, but I do not see any basis in prevailing first amendment theory for stepping in and halting this investigation.

## II.

The question of whether the government may inquire into the truthfulness of statements of fact in a work of nonfiction—and prosecute the author for knowing or reckless falsehoods—is analytically distinct from the question of *how* the government may proceed. Over the past fifteen years, the problems associated with attempts by government investigators to compel the press to turn over unpublished information in its possession have received considerable attention. This court, in an attempt to accommodate the competing interests, and under the authority of Federal Rule of Evidence 501,[5] has recognized an evidentiary privilege for journalists. *See Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979). Most relevant in the context of this case, we have held that "journalists possess a qualified privilege not to divulge confidential sources *and not to disclose unpublished information in their possession in criminal cases." United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980) (emphasis added), *cert. denied,* 449 U.S.

1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). *See also United States v. Criden,* 633 F.2d 346, 348 (3d Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981).

*Cuthbertson* involved an order for CBS to produce all statements given to "60 Minutes" investigators by government witnesses. Writing for the court, Judge Seitz specifically rejected the contention that the privilege was limited to protecting confidential sources:

> We do not think the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes.... Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foundation for the privilege.

630 F.2d at 147. We found that a privilege against disclosure of a reporter's "sources and unpublished notes" is necessary for "protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure...." *Id.* I believe that the latter two concerns—and possibly even the first—are implicated by the government's sweeping request for appellant's notes and records. The "hassle" and exposure that complying with subpoenas such as this one may entail, it has been observed, may lead journalists to suppress writings that could pique a prosecutor's curiosity. *See* Blasi, *The Newsman's Privilege: An Empirical Study,* 70 Mich.L. Rev. 229, 265 (1971); Comment, *The Newsman's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation,* 58 Calif.L.Rev. 1198, 1207–08 (1970). Professor Blasi empirically verified that the "reporters most hindered by the possibility of being subpoenaed are those

---

**5.** This rule provides in relevant part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authori-

ty, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience....

who seek a composite picture, who check and cross-check their information with numerous sources ... and who keep extensive files and tapes for future verification reference...." 70 Mich.L.Rev. at 271. *See also United States v. Burke,* 700 F.2d 70 (2d Cir.) (privilege extends to magazine's "work papers"), *cert. denied,* — U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

Concededly, our prior cases do not deal with the. precise situation we now have before us—where a subpoena is directed to the author of a book who is the target of a grand jury investigation into the truthfulness of his assertions of fact—but I believe that the privilege and its rationale are broad enough to cover this case. In *Cuthbertson* we recognized that even compelled production of unpublished information for *in camera* inspection by the court may inhibit the gathering and dissemination of information, and we applied the privilege to such an order. 630 F.2d at 148. *See also New York Times Co. v. Jascalevich,* 439 U.S. 1304, 98 S.Ct. 3060, 58 L.Ed.2d 12 (1978) (Marshall, Circuit Justice). *A fortiori,* it should apply to grand jury subpoenas.[6] Nor can it matter that appellant's medium was a book, rather than a newspaper article (as in *Criden*) or a television news magazine (as in *Cuthbertson*). And finally, I do not think the journalist's privilege, any more than any other evidentiary privilege, can evaporate merely because the person claiming it is the target of the investigation, though undoubtedly it may be somewhat easier for prosecutors to overcome the privilege in this situation. Indeed, in *Cuthbertson* and *Criden* we recognized that even the fifth and sixth amendment rights *of a defendant seeking exculpatory information* cannot vitiate the privilege—rather, these are interests that the privilege is designed to accommodate. The grand jury's interest in investigating and accusing clearly stands on no higher plane than a defendant's right to compulsory process. *See generally* Comment, *The*

*Newsperson's Privilege in Grand Jury Proceedings: An Argument for Uniform Recognition and Application,* 75 J.Crim.L. & Criminology 413 (1984). Like other evidentiary privileges, this one simply recognizes that some interests and relationships are "of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Herbert v. Lando,* 441 U.S. at 183, 99 S.Ct. at 1652 (Brennan, J., dissenting) (quoting *McCormick on Evidence* 152 (2d ed. 1972) ).

The journalist's privilege accommodates these competing interests by permitting access to unpublished information held by journalists where a three-part showing is made:

> First, the movant must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the court that the information sought is crucial to the claim.

*Criden,* 633 F.2d at 358–59. I have carefully reviewed the government's *Schofield* submissions, and I am convinced that they cannot meet this burden. Their sweeping subpoena would require production of some information that could have only the most attenuated relevance to any alleged mail fraud; for example, "[a]ny and all handwritten or typed documents containing the name, signature, or any other notation connotating the names of Pope John Paul II, John Cardinal Krol, Cardinal Rubin, Cardinal Wyszynski and/or Cardinal Glemp for the period January 1, 1979 to the present." Though the government claims this request is necessary to determine whether there exists written correspondence between Gronowicz and the individuals named, I think it is clear that it must encompass nearly every piece of paper appellant accu-

---

**6.** As a general rule, evidentiary privileges apply to grand jury proceedings. *See United States v. Calandra,* 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974) ("[T]he grand jury's subpoe-

na power is not unlimited. It ... may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law.") (footnote omitted); *see also* Fed.R.Evid. 1101.

mulated in preparing *God's Broker*. The subpoena further seeks "[a]ny and all written correspondence and/or letters bearing the signature of any agent, employee or representative of the Vatican and/or the Archdiocese of Philadelphia for the time period January 1, 1979 to the present." It is necessary that these documents be examined, we are told, "to determine what representations were made to agents of the Roman Catholic Church in order to garner the various statements which Gronowicz makes in the book." Mail and wire fraud are concerned with false representations used to obtain money or property, not with representations made to garner statements. The breadth of these requests bespeaks a fishing expedition, not an attempt to obtain "crucial" information. Much of the material sought that might arguably be "crucial" could probably be obtained from sources other than the appellant. In any event, the record does not indicate that the government has made any effort to conduct its investigation in a manner less threatening to a free press.

In this case, the government has utterly failed to contend or to show that it cannot develop the information it seeks through *other* sources, without having to explore the author's notes and records. My disagreement with the majority is not as to whether mail fraud *can* be investigated, but rather as to *how* it can be investigated when the *Cuthbertson* privilege is involved. I have no doubt that the repeal of the *Cuthbertson* privilege would be a great convenience to prosecutors. But until that tragic day occurs prosecutors must live with the rule and at least pursue other sources before compelling production of an author's notes and records, and even then they must narrowly circumscribe their subpoenas.

The government has not made a showing of need that would overcome appellant's qualified privilege to resist disclosure of documents compiled in the preparation of *God's Broker*. Therefore, I would reverse the judgment of contempt on this narrow ground. Such a disposition would not preclude the government from continuing this investigation or, indeed, from seeking enforcement of a modified subpoena.

SLOVITER, Circuit Judge, dissenting.

I join in Judge Hunter's dissent and, as a secondary position, concur in Part II of Judge Higginbotham's dissenting opinion asserting that the government's *Schofield* submissions were inadequate to overcome Gronowicz' journalists' privilege. I write separately only to express my profound concern about the First Amendment values that the court has undermined by its decision today.

I sense an unarticulated unease in the opinions of most of my colleagues, somewhat like the bogeyman a frightened child is unwilling to describe for fear that it will then assume the mantle of reality. But if the emperor has no clothes, we should say so. The holding of this court opens the way for use of the uniquely powerful weapon of a grand jury investigation to inhibit publication of books because of their content not only by an unscrupulous prosecutor but, what is more dangerous, by one who is imbued with a sense of zealous righteousness.

This case is not governed by any of the authorities relied on by the majority. This is not, as one of my colleagues suggested at oral argument, a publication from "a mail order house advertis[ing] a book saying that if you buy it and read it, you will be able to lose weight without diet, without exercise and without medicine." Transcript of oral argument at 6. It has not been denied that at issue is a matter of legitimate public interest.

Nor is this like a prosecution for criminal libel which, as the Supreme Court has noted, has virtually disappeared. *See Garrison v. Louisiana*, 379 U.S. 64, 69, 85 S.Ct. 209, 213, 13 L.Ed.2d 125 (1964). The majority, while citing to that portion of *Garrison* that held that truth, unlike calculated falsehood, is an absolute defense to such a prosecution, has failed to point out that in the same opinion Justice Brennan, writing for the Court with no dissent, strongly

suggested that criminal libel must be limited to speech that has a clear and present danger of leading to public disorder. *Id.* at 70, 85 S.Ct. at 213. He approvingly referred to the absence of any criminal libel statute in the then pending draft of the Model Penal Code of the American Law Institute, and to the Reporters' explanation eliminating such a statute because "[u]sually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of 'security'." *Id.* at 70, 85 S.Ct. at 213, *quoting* Model Penal Code, Tent. Draft No. 13, 1961, § 250.7, Comments at 44. *God's Broker* has not been alleged to be "speech calculated to cause breaches of the peace." The majority's suggestion that the Court's holding in *Garrison* that defenses available in civil libel suits are also available in criminal libel prosecutions was thereby a rejection of any distinction between civil and criminal libel actions is not only wrong but may be dangerous if it forebodes an approval of criminal libel prosecutions, now in general disrepute.

I am not as disturbed as are some of my colleagues that lurking behind the book is the possibility of fraud. If either the publisher or the putative movie producer has in fact been defrauded, there is ample opportunity for them to recover in civil litigation. I am distressed because the majority fails to recognize the quintessential difference between the issue here and that presented in the civil libel cases from which it freely borrows—and that is the role played by the government and its ability to control, and even manipulate, the grand jury.

The following colloquy took place during the oral argument between this writer and the United States Attorney:

THE COURT: ... Suppose in the 1970's, two authors went to a publisher and they said, "We have some information from somebody we'll call Deep Throat in the government who is feeding us—who has fed us with information about what's happening in the White House," ... could the administration then say that's false and we are going to have a Grand Jury investigation to ascertain the truth or falsity of that central issue even before the book came out or if the book came out, even thereafter?

Is the analogy apt and would you answer?

MR. DENNIS: I think the analogy is apt and I answer it this way: The power to investigate and the power to prosecute is the power to intimidate, it's the power to disrupt and it is certainly the power, perhaps, to intimidate an author from not publishing a book.

.     .     .     .     .

I think that it is always a risk that a government agency could abuse its authority for purposes of expressing ideas and thoughts that might be dangerous to the current administration or that might displease government officials.

THE COURT: ... And if there is this risk that you say there may be by government in power, where does the First Amendment protect an individual?

MR. DENNIS: I think that the first line of protection does come under the challenge on the basis of Grand Jury abuse and none was found here. There is simply no basis for the Court to conclude and the district court did not find and the panel in this case did not find that the motive for this investigation had anything to do with offending the government or government officials with regard to the contents of that book. Transcript of Oral Argument at 21–23.

The investigation that served as the focus of the court's questions was that by Woodward and Bernstein into the Watergate affair, an investigation that contributed to the resignation of a President. Gronowicz lists the following as other possible targets of grand jury investigation for offending "the sensibilities of the powerful." Appellant's brief at 7–8: "Rachel Carson's *Silent Spring;* Seymour Hersh's *Kissinger;* Ralph Nader's *Unsafe at Any Speed;* William Shawcross's *Sideshow: Kissinger, Nixon and the Destruction of Cambodia;* [and Walter & Miriam] Schneir's book on the Rosenberg case, *Invitation to an In-*

*quest*". Searching somewhat deeper into history, one could add Charles Darwin's *Origin of the Species* and the works of Galileo, all of which were seen in their time as threatening the views of the established orthodoxy. It is unrealistic to believe that "ideas, opinion, viewpoints, and beliefs," which Judge Higginbotham would protect from prosecution are going to be published without an accompanying assertion of "statements of fact", the bricks on which the edifice of ideas must be constructed. If such "facts", whether they concern the descendency of humans from apes, the motion of the earth around the sun, or the unlawful behavior of all the president's men, can be the proper subject of a criminal investigation into truth, then the First Amendment is ephemeral protection for the ideas and opinions on which they are based.

The majority, the concurrers, and Judge Higginbotham in his dissent all adopt the government's position that the limit of the protection against the inhibiting effect of criminal investigation into writings of public interest is the availability of a challenge that the grand jury inquiry or its subpoena is not undertaken to further a proper grand jury investigation. I am unwilling to place all my reliance on a reed of such an evanescent quality since regrettably there is, as yet, no precedent to support Judge Becker's position that the government may have a heavier burden to meet the *Schofield II* requirement in such a case.

The absence of any precedent as direct authority to support quashing the subpoena and reversing the contempt citation is telling evidence that no earlier government in this country has used the criminal process to inquire into the validity of a book, pamphlet, or other writing that deals with an important public issue. Even were the assertions in Gronowicz's book inaccurate, and even were it to be found that they were deliberately so, an issue on which I have no opinion, I would hold that a criminal prosecution focusing on the truth of the contents would be incompatible with the First Amendment. We have constructed an elaborate system in our criminal law that is designed to protect one innocent defendant, even at the expense of leaving numerous guilty persons go free. *See* 4 Blackstone, Commentaries *358. Is it not at least equally important to relegate one potentially fraudulent book to the remedy provided by the civil law in order to insure that there is no inhibition in the future on speech concerning public affairs? After all, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. at 74–75, 85 S.Ct. at 216.