## UNITED STATES *v.* BALLARD ET AL.

No. 472.   Argued March 3, 6, 1944.—Decided April 24, 1944.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark, Mr. Robert S. Erdahl,* and *Miss*

*Beatrice Rosenberg* were on the brief, for the United States.

*Messrs. Roland Rich Woolley* and *Joseph F. Rank,* with whom *Mr. Ralph C. Curren* was on the brief, for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents were indicted and convicted for using, and conspiring to use, the mails to defraud. § 215 Criminal Code, 18 U. S. C. § 338; § 37 Criminal Code, 18 U. S. C. § 88. The indictment was in twelve counts. It charged a scheme to defraud by organizing and promoting the I Am movement through the use of the mails. The charge was that certain designated corporations were formed, literature distributed and sold, funds solicited, and memberships in the I Am movement sought "by means of false and fraudulent representations, pretenses and promises." The false representations charged were eighteen in number. It is sufficient at this point to say that they covered respondents' alleged religious doctrines or beliefs. They were all set forth in the first count. The following are representative:

> that Guy W. Ballard, now deceased, alias Saint Germain, Jesus, George Washington, and Godfre Ray King, had been selected and thereby designated by the alleged "ascertained masters," Saint Germain, as a divine messenger; and that the words of "ascended masters" and the words of the alleged divine entity, Saint Germain, would be transmitted to mankind through the medium of the said Guy W. Ballard;

> that Guy W. Ballard, during his lifetime, and Edna W. Ballard, and Donald Ballard, by reason of their alleged high spiritual attainments and righteous conduct, had been selected as divine messengers through which the words of the alleged "ascended masters," in-

cluding the alleged Saint Germain, would be communicated to mankind under the teachings commonly known as the "I Am" movement;

that Guy W. Ballard, during his lifetime, and Edna W. Ballard and Donald Ballard had, by reason of supernatural attainments, the power to heal persons of ailments and diseases and to make well persons afflicted with any diseases, injuries, or ailments, and did falsely represent to persons intended to be defrauded that the three designated persons had the ability and power to cure persons of those diseases normally classified as curable and also of diseases which are ordinarily classified by the medical profession as being incurable diseases; and did further represent that the three designated persons had in fact cured either by the activity of one, either, or all of said persons, hundreds of persons afflicted with diseases and ailments;

Each of the representations enumerated in the indictment was followed by the charge that respondents "well knew" it was false. After enumerating the eighteen misrepresentations the indictment also alleged:

At the time of making all of the afore-alleged representations by the defendants, and each of them, the defendants, and each of them, well knew that all of said aforementioned representations were false and untrue and were made with the intention on the part of the defendants, and each of them, to cheat, wrong, and defraud persons intended to be defrauded, and to obtain from persons intended to be defrauded by the defendants, money, property, and other things of value and to convert the same to the use and the benefit of the defendants, and each of them;

The indictment contained twelve counts, one of which charged a conspiracy to defraud. The first count set forth all of the eighteen representations, as we have said. Each of the other counts incorporated and realleged all of them and added no additional ones. There was a demurrer and a motion to quash, each of which asserted, among other things, that the indictment attacked the religious beliefs

of respondents and sought to restrict the free exercise of their religion in violation of the Constitution of the United States. These motions were denied by the District Court. Early in the trial, however, objections were raised to the admission of certain evidence concerning respondents' religious beliefs. The court conferred with counsel in absence of the jury and with the acquiescence of counsel for the United States and for respondents confined the issues on this phase of the case to the question of the good faith of respondents. At the request of counsel for both sides the court advised the jury of that action in the following language:

Now, gentlemen, here is the issue in this case:

First, the defendants in this case made certain representations of belief in a divinity and in a supernatural power. Some of the teachings of the defendants, representations, might seem extremely improbable to a great many people. For instance, the appearance of Jesus to dictate some of the works that we have had introduced in evidence, as testified to here at the opening transcription, or shaking hands with Jesus, to some people that might seem highly improbable. I point that out as one of the many statements.

Whether that is true or not is not the concern of this Court and is not the concern of the jury—and they are going to be told so in their instructions. As far as this Court sees the issue, it is immaterial what these defendants preached or wrote or taught in their classes. They are not going to be permitted to speculate on the actuality of the happening of those incidents. Now, I think I have made that as clear as I can. Therefore, the religious beliefs of these defendants cannot be an issue in this court.

The issue is: Did these defendants honestly and in good faith believe those things? If they did, they should be acquitted. I cannot make it any clearer than that.

If these defendants did not believe those things, they did not believe that Jesus came down and dic-

tated, or that Saint Germain came down and dictated, did not believe the things that they wrote, the things that they preached, but used the mail for the purpose of getting money, the jury should find them guilty. Therefore, gentlemen, religion cannot come into this case.

The District Court reiterated that admonition in the charge to the jury and made it abundantly clear. The following portion of the charge is typical:

The question of the defendants' good faith is the cardinal question in this case. You are not to be concerned with the religious belief of the defendants, or any of them. The jury will be called upon to pass on the question of whether or not the defendants honestly and in good faith believed the representations which are set forth in the indictment, and honestly and in good faith believed that the benefits which they represented would flow from their belief to those who embraced and followed their teachings, or whether these representations were mere pretenses without honest belief on the part of the defendants or any of them, and, were the representations made for the purpose of procuring money, and were the mails used for this purpose.

As we have said, counsel for the defense acquiesced in this treatment of the matter, made no objection to it during the trial, and indeed treated it without protest as the law of the case throughout the proceedings prior to the verdict. Respondents did not change their position before the District Court after verdict and contend that the truth or verity of their religious doctrines or beliefs should have been submitted to the jury. In their motion for new trial they did contend, however, that the withdrawal of these issues from the jury was error because it was in effect an amendment of the indictment. That was also one of their specifications of errors on appeal. And other errors urged on appeal included the overruling of the demurrer to the indictment and the motion to quash, and the

disallowance of proof of the truth of respondents' religious doctrines or beliefs.

The Circuit Court of Appeals reversed the judgment of conviction and granted a new trial, one judge dissenting. 138 F. 2d 540. In its view the restriction of the issue in question to that of good faith was error. Its reason was that the scheme to defraud alleged in the indictment was that respondents made the eighteen alleged false representations; and that to prove that defendants devised the scheme described in the indictment "it was necessary to prove that they schemed to make some, at least, of the (eighteen) representations . . . and that some, at least, of the representations which they schemed to make were false." 138 F. 2d 545. One judge thought that the ruling of the District Court was also error because it was "as prejudicial to the issue of honest belief as to the issue of purposeful misrepresentation." *Id.*, p. 546.

The case is here on a petition for a writ of certiorari which we granted because of the importance of the question presented.

The United States contends that the District Court withdrew from the jury's consideration only the truth or falsity of those representations which related to religious concepts or beliefs and that there were representations charged in the indictment which fell within a different category.[1] The argument is that this latter group of

---

[1] Petitioner has placed three representations in this group: (1) A portion of the scheme as to healing which we have already quoted and which alleged that respondents "had in fact cured either by the activity of one, either, or all of said persons, hundreds of persons afflicted with diseases and ailments"; (2) The portion of the scheme relating to certain religious experiences described in certain books (Unveiled Mysteries and The Magic Presence) and concerning which the indictment alleged "that the defendants represented that Guy W. Ballard, Edna W. Ballard, and Donald Ballard actually encountered the experiences pertaining to each of their said names as related and

representations was submitted to the jury, that they were adequate to constitute an offense under the Act, and that they were supported by the requisite evidence. It is thus sought to bring the case within the rule of *Hall* v. *United States*, 168 U. S. 632, 639–640, which held that where an indictment contained "all the necessary averments to constitute an offense created by the statute," a conviction would not be set aside because a "totally immaterial fact" was averred but not proved. We do not stop to ascertain the relevancy of that rule to this case, for we are of the view that all of the representations charged in the indictment which related at least in part to the religious doctrines or beliefs of respondents were withheld from the jury. The trial judge did not differentiate them. He referred in the charge to the "religious beliefs" and "doctrines taught by the defendants" as matters withheld from the jury. And in stating that the issue of good faith was the "cardinal question" in the case he charged, as already noted, that "The jury will be called upon to pass on the question of whether or not the defendants honestly and in good faith believed the representations which are set forth in the indictment." Nowhere in the charge were any of the separate representations submitted to the jury. A careful reading of the whole charge leads us to agree with the Circuit Court of Appeals on this phase of the case that the only issue submitted to the jury was the question as stated by the District Court, of respondents' "belief in their representations and promises."

The United States contends that respondents acquiesced in the withdrawal from the jury of the truth of their reli-

set forth in said books, whereas in truth and in fact none of said persons did encounter the experiences"; (3) The part of the scheme concerning phonograph records sold by respondents on representations that they would bestow on purchasers "great blessings and rewards in their aim to achieve salvation" whereas respondents "well knew that said . . . records were man-made and had no ability to aid in achieving salvation."

gious doctrines or beliefs and that their consent bars them from insisting on a different course once that one turned out to be unsuccessful. Reliance for that position is sought in *Johnson* v. *United States*, 318 U. S. 189. That case stands for the proposition that, apart from situations involving an unfair trial, an appellate court will not grant a new trial to a defendant on the ground of improper introduction of evidence or improper comment by the prosecutor, where the defendant acquiesced in that course and made no objection to it. In fairness to respondents that principle cannot be applied here. The real objection of respondents is not that the truth of their religious doctrines or beliefs should have been submitted to the jury. Their demurrer and motion to quash made clear their position that that issue should be withheld from the jury on the basis of the First Amendment. Moreover, their position at all times was and still is that the court should have gone the whole way and withheld from the jury both that issue and the issue of their good faith. Their demurrer and motion to quash asked for dismissal of the entire indictment. Their argument that the truth of their religious doctrines or beliefs should have gone to the jury when the question of their good faith was submitted was and is merely an alternative argument. They never forsook their position that the indictment should have been dismissed and that none of it was good. Moreover, respondents' motion for new trial challenged the propriety of the action of the District Court in withdrawing from the jury the issue of the truth of their religious doctrines or beliefs without also withdrawing the question of their good faith. So we conclude that the rule of *Johnson* v. *United States, supra,* does not prevent respondents from reasserting now that no part of the indictment should have been submitted to the jury.

As we have noted, the Circuit Court of Appeals held that the question of the truth of the representations concerning

respondents' religious doctrines or beliefs should have been submitted to the jury. And it remanded the case for a new trial. It may be that the Circuit Court of Appeals took that action because it did not think that the indictment could be properly construed as charging a scheme to defraud by means other than misrepresentations of respondents' religious doctrines or beliefs. Or that court may have concluded that the withdrawal of the issue of the truth of those religious doctrines or beliefs was unwarranted because it resulted in a substantial change in the character of the crime charged. But on whichever basis that court rested its action, we do not agree that the truth or verity of respondents' religious doctrines or beliefs should have been submitted to the jury. Whatever this particular indictment might require, the First Amendment precludes such a course, as the United States seems to concede. "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson* v. *Jones,* 13 Wall. 679, 728. The First Amendment has a dual aspect. It not only "forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship" but also "safeguards the free exercise of the chosen form of religion." *Cantwell* v. *Connecticut,* 310 U. S. 296, 303. "Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Id.,* pp. 303–304. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. *Board of Education* v. *Barnette,* 319 U. S. 624. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others.

Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. *Murdock* v. *Pennsylvania,* 319 U. S. 105. As stated in *Davis* v. *Beason,* 133 U. S. 333, 342, "With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with." See *Prince*

v. *Massachusetts,* 321 U. S. 158. So we conclude that the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of respondents.

Respondents maintain that the reversal of the judgment of conviction was justified on other distinct grounds. The Circuit Court of Appeals did not reach those questions. Respondents may, of course, urge them here in support of the judgment of the Circuit Court of Appeals. *Langnes* v. *Green,* 282 U. S. 531, 538–539; *Story Parchment Co.* v. *Paterson Co.,* 282 U. S. 555, 560, 567–568. But since attention was centered on the issues which we have discussed, the remaining questions were not fully presented to this Court either in the briefs or oral argument. In view of these circumstances we deem it more appropriate to remand the cause to the Circuit Court of Appeals so that it may pass on the questions reserved. *Lutcher & Moore Lumber Co.* v. *Knight,* 217 U. S. 257, 267–268; *Brown* v. *Fletcher,* 237 U. S. 583. If any questions of importance survive and are presented here, we will then have the benefit of the views of the Circuit Court of Appeals. Until that additional consideration is had, we cannot be sure that it will be necessary to pass on any of the other constitutional issues which respondents claim to have reserved.

The judgment is reversed and the cause is remanded to the Circuit Court of Appeals for further proceedings in conformity to this opinion.

*Reversed.*

MR. CHIEF JUSTICE STONE, dissenting:

I am not prepared to say that the constitutional guaranty of freedom of religion affords immunity from crimminal prosecution for the fraudulent procurement of money by false statements as to one's religious experiences,

more than it renders polygamy or libel immune from criminal prosecution. *Davis* v. *Beason,* 133 U. S. 333; see *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572; cf. *Patterson* v. *Colorado,* 205 U. S. 454, 462; *Near* v. *Minnesota,* 283 U. S. 697, 715. I cannot say that freedom of thought and worship includes freedom to procure money by making knowingly false statements about one's religious experiences. To go no further, if it were shown that a defendant in this case had asserted as a part of the alleged fraudulent scheme, that he had physically shaken hands with St. Germain in San Francisco on a day named, or that, as the indictment here alleges, by the exertion of his spiritual power he "had in fact cured . . . hundreds of persons afflicted with diseases and ailments," I should not doubt that it would be open to the Government to submit to the jury proof that he had never been in San Francisco and that no such cures had ever been effected. In any event I see no occasion for making any pronouncement on this subject in the present case.

The indictment charges respondents' use of the mails to defraud and a conspiracy to commit that offense by false statements of their religious experiences which had not in fact occurred. But it also charged that the representations were "falsely and fraudulently" made, that respondents "well knew" that these representations were untrue, and that they were made by respondents with the intent to cheat and defraud those to whom they were made. With the assent of the prosecution and the defense the trial judge withdrew from the consideration of the jury the question whether the alleged religious experiences had in fact occurred, but submitted to the jury the single issue whether petitioners honestly believed that they had occurred, with the instruction that if the jury did not so find, then it should return a verdict of guilty. On this

issue the jury, on ample evidence that respondents were without belief in the statements which they had made to their victims, found a verdict of guilty. The state of one's mind is a fact as capable of fraudulent misrepresentation as is one's physical condition or the state of his bodily health. See *Seven Cases* v. *United States,* 239 U. S. 510, 517; cf. *Durland* v. *United States,* 161 U. S. 306, 313. There are no exceptions to the charge and no contention that the trial court rejected any relevant evidence which petitioners sought to offer. Since the indictment and the evidence support the conviction, it is irrelevant whether the religious experiences alleged did or did not in fact occur or whether that issue could or could not, for constitutional reasons, have been rightly submitted to the jury. Certainly none of respondents' constitutional rights are violated if they are prosecuted for the fraudulent procurement of money by false representations as to their beliefs, religious or otherwise.

Obviously if the question whether the religious experiences in fact occurred could not constitutionally have been submitted to the jury the court rightly withdrew it. If it could have been submitted I know of no reason why the parties could not, with the advice of counsel, assent to its withdrawal from the jury. And where, as here, the indictment charges two sets of false statements, each independently sufficient to sustain the conviction, I cannot accept respondents' contention that the withdrawal of one set and the submission of the other to the jury amounted to an amendment of the indictment.

An indictment is amended when it is so altered as to charge a different offense from that found by the grand jury. *Ex parte Bain,* 121 U. S. 1. But here there was no alteration of the indictment, *Salinger* v. *United States,* 272 U. S. 542, 549, nor did the court's action, in effect, add anything to it by submitting to the jury matters which

it did not charge. *United States* v. *Norris,* 281 U. S. 619, 622. In *Salinger* v. *United States, supra,* 548–9, we explicitly held that where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment. See also *Goto* v. *Lane,* 265 U. S. 393, 402–3; *Ford* v. *United States,* 273 U. S. 593, 602. Were the rule otherwise the common practice of withdrawing from the jury's consideration one count of an indictment while submitting others for its verdict, sustained in *Dealy* v. *United States,* 152 U. S. 539, 542, would be a fatal error.

We may assume that under some circumstances the submission to the jury of part only of the matters alleged in the indictment might result in such surprise to the defendant as to amount to the denial of a fair trial. But, as in the analogous case of a variance between pleading and proof, a conviction can be reversed only upon a showing of injury to the "substantial rights" of the accused. *Berger* v. *United States,* 295 U. S. 78, 82. Here no claim of surprise has been or could be made. The indictment plainly charged both falsity of, and lack of good faith belief in the representations made, and it was agreed at the outset of the trial, without objection from the defendants, that only the issue of respondents' good faith belief in the representations of religious experiences would be submitted to the jury. Respondents, who were represented by counsel, at no time in the course of the trial offered any objection to this limitation of the issues, or any contention that it would result in a prohibited amendment of the indictment. So far as appears from the record before us the point was raised for the first time in the specifications of errors in the Circuit Court of Appeals. It is asserted that it was argued to the District Court on

motions for new trial and in arrest of judgment. If so, there was still no surprise by a ruling to which, as we have said, respondents' counsel assented when it was made.

On the issue submitted to the jury in this case it properly rendered a verdict of guilty. As no legally sufficient reason for disturbing it appears, I think the judgment below should be reversed and that of the District Court reinstated.

MR. JUSTICE ROBERTS and MR. JUSTICE FRANKFURTER join in this opinion.

MR. JUSTICE JACKSON, dissenting:

I should say the defendants have done just that for which they are indicted. If I might agree to their conviction without creating a precedent, I cheerfully would do so. I can see in their teachings nothing but humbug, untainted by any trace of truth. But that does not dispose of the constitutional question whether misrepresentation of religious experience or belief is prosecutable; it rather emphasizes the danger of such prosecutions.

The Ballard family claimed miraculous communication with the spirit world and supernatural power to heal the sick. They were brought to trial for mail fraud on an indictment which charged that their representations were false and that they "well knew" they were false. The trial judge, obviously troubled, ruled that the court could not try whether the statements were untrue, but could inquire whether the defendants knew them to be untrue; and, if so, they could be convicted.

I find it difficult to reconcile this conclusion with our traditional religious freedoms.

In the first place, as a matter of either practice or philosophy I do not see how we can separate an issue as to what is believed from considerations as to what is believable. The most convincing proof that one believes his statements is to show that they have been true in his expe-

rience. Likewise, that one knowingly falsified is best proved by showing that what he said happened never did happen. How can the Government prove these persons knew something to be false which it cannot prove to be false? If we try religious sincerity severed from religious verity, we isolate the dispute from the very considerations which in common experience provide its most reliable answer.

In the second place, any inquiry into intellectual honesty in religion raises profound psychological problems. William James, who wrote on these matters as a scientist, reminds us that it is not theology and ceremonies which keep religion going. Its vitality is in the religious experiences of many people. "If you ask what these experiences are, they are conversations with the unseen, voices and visions, responses to prayer, changes of heart, deliverances from fear, inflowings of help, assurances of support, whenever certain persons set their own internal attitude in certain appropriate ways." [1] If religious liberty includes, as it must, the right to communicate such experiences to others, it seems to me an impossible task for juries to separate fancied ones from real ones, dreams from happenings, and hallucinations from true clairvoyance. Such experiences, like some tones and colors, have existence for one, but none at all for another. They cannot be verified to the minds of those whose field of consciousness does not include religious insight. When one comes to trial which turns on any aspect of religious belief or representation, unbelievers among his judges are likely not to understand and are almost certain not to believe him.

And then I do not know what degree of skepticism or disbelief in a religious representation amounts to actionable fraud. James points out that "Faith means belief

[1] William James, Collected Essays and Reviews, pp. 427–8; see generally his Varieties of Religious Experience and The Will to Believe. See also Burton, Heyday of a Wizard.

in something concerning which doubt is still theoretically possible.'"[2] Belief in what one may demonstrate to the senses is not faith. All schools of religious thought make enormous assumptions, generally on the basis of revelations authenticated by some sign or miracle. The appeal in such matters is to a very different plane of credulity than is invoked by representations of secular fact in commerce. Some who profess belief in the Bible read literally what others read as allegory or metaphor, as they read Aesop's fables. Religious symbolism is even used by some with the same mental reservations one has in teaching of Santa Claus or Uncle Sam or Easter bunnies or dispassionate judges. It is hard in matters so mystical to say how literally one is bound to believe the doctrine he teaches and even more difficult to say how far it is reliance upon a teacher's literal belief which induces followers to give him money.

There appear to be persons—let us hope not many—who find refreshment and courage in the teachings of the "I Am" cult. If the members of the sect get comfort from the celestial guidance of their "Saint Germain," however doubtful it seems to me, it is hard to say that they do not get what they pay for. Scores of sects flourish in this country by teaching what to me are queer notions. It is plain that there is wide variety in American religious taste. The Ballards are not alone in catering to it with a pretty dubious product.

The chief wrong which false prophets do to their following is not financial. The collections aggregate a tempting total, but individual payments are not ruinous. I doubt if the vigilance of the law is equal to making money stick by over-credulous people. But the real harm is on the mental and spiritual plane. There are those who hunger and thirst after higher values which they feel wanting in

---

[2] William James, The Will to Believe, p. 90.

their humdrum lives. They live in mental confusion or moral anarchy and seek vaguely for truth and beauty and moral support. When they are deluded and then disillusioned, cynicism and confusion follow. The wrong of these things, as I see it, is not in the money the victims part with half so much as in the mental and spiritual poison they get. But that is precisely the thing the Constitution put beyond the reach of the prosecutor, for the price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish.

Prosecutions of this character easily could degenerate into religious persecution. I do not doubt that religious leaders may be convicted of fraud for making false representations on matters other than faith or experience, as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes. But that is not this case, which reaches into wholly dangerous ground. When does less than full belief in a professed credo become actionable fraud if one is soliciting gifts or legacies? Such inquiries may discomfort orthodox as well as unconventional religious teachers, for even the most regular of them are sometimes accused of taking their orthodoxy with a grain of salt.

I would dismiss the indictment and have done with this business of judicially examining other people's faiths.