**In re THE BIBLE SPEAKS, Debtor.**

**Bankruptcy No. 86–40392–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

Jan. 30, 1987.

See also, Bkrtcy., 69 B.R. 368.

Gordon T. Walker, McDermott, Will & Emery, C. Hall Swaim, Hale & Dorr, Boston, Mass., for Elizabeth Dovydenas.

Norman Roy Grutman, Grutman, Miller, Greenspoon & Hendler, New York City, Charles W. Morse, Jr., Sullivan & Worcester, Boston, Mass., for The Bible Speaks.

Philip J. Hendel, Hendel, Collins, Stocks & Newton, Springfield, Mass., for Creditors' Committee.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Elizabeth Dovydenas (the "Claimant") asserts a $6.5 million claim against The Bible Speaks, the Debtor in this Chapter 11 proceeding. She alleges that the contributions she made to the Debtor in this amount were made without donative intent and were induced by undue influence and fraud. The Debtor has objected to her

claim, and a trial on the objection has been scheduled. The matter now before the Court is the Debtor's request for a determination, prior to trial, of questions pertaining to the free exercise of religion clause of the First Amendment, which the Debtor contends lie at the core of this controversy.

The Debtor moves that the Claimant be prohibited from obtaining discovery of information concerning religious beliefs, religious doctrines or religious subjects of any kind, and particularly concerning communications on these matters between the Claimant and representatives of the Debtor.[1] Beyond this, the Debtor requests that discovery not be permitted concerning communications among the Debtor's present or former pastors, employees and parishioners unless the communications relate to the Claimant, her husband or her family, and unless the subject matter thereof was secular rather than religious. For the reasons set forth below, the motion is denied.

The Debtor is a Christian fundamentalist Church. It has local parishioners and supports foreign missions. The Debtor also operates two schools, one for children in kindergarten through the twelfth grade, and one for adults, known as The Stevens School of the Bible. The Debtor is a religious organization entitled to the protection intended for such organizations under the First Amendment, and the Claimant does not contend otherwise.[2] We must, in any event, take an expansive view of what beliefs and practices are entitled to protection under the free exercise clause. *See United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944) (Drafters of Constitution contemplated "widest possible toleration" of religious views).

■ The Debtor is afforded no protection by those decisions[3] holding that the First Amendment prohibits the entangle-

1. The Debtor seeks to prohibit the following questions (and similar questions) which were asked in prior litigation between the parties:
(a) Did you not have discussions with Mrs. Dovydenas on a number of occassions in 1984 and 1985 with respect to her duty to give money to the Church?
(b) You didn't tell Mrs. Dovydenas that she had a calling or a duty to give money to you?
(c) Did you tell [Mrs. Dovydenas] that her husband was possessed by devils?
(d) Did you tell her that God wanted her to give money to the Church?
(e) Did you tell her in 1985 that her family was evil ...?
(f) Did you tell [Mrs. Dovydenas] that her family, her father, mother, sisters, were possessed by demons?
(g) Are you [Pastor Stevens] aware that Mrs. Stevens had communicated with Mrs. Dovydenas on the subject of how to deal with an unbelieving husband?
(h) Did you not have some conversation with Mrs. Dovydenas late in 1985 on the subject of Mr. Freed's battle with demons?
(i) Did you give Mrs. Dovydenas prayer lists from time to time?
(j) Did you instruct Mrs. Dovydenas to pray for guidance to give funds to The Bible Speaks?
(k) Did you instruct her to pray for guidance to give funds for the purchase of an airplane?
(*l*) Are you acquainted with the term "shepherding," Mrs. Hill?
(m) Did you not tell her on a daily basis over a period of eighteen months or so that non-members of the Church were possessed by demons?

(n) Did you [Mrs. Hill] not tell Mrs. Dovydenas during this time in 1985 that if she gave all of her money to the Church she would not die but would be raptured? What does that mean to be raptured?
(o) You [Mrs. Hill] told her [Mrs. Dovydenas] every day that God's work dictated that she remove her funds from the family investment company, isn't that right?
(p) During the discussion ... which took place at these private counseling sessions in Mr. Stevens' office he told her it was God's will that she give her money to The Bible Speaks, did he not?
(q) Did you [Mrs. Hill] or Mr. Stevens, to your knowledge, tell Betsy that there would be no relationship between her giving five million dollars to The Bible Speaks and whether Mr. Turkia would be let out of prison?

2. *Cf. Van Schaick v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1144 (D.Mass. 1982) (Court required proof of religious nature of organization which did not espouse an "established" religion).

3. *See, e.g., Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Catheral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

ment of courts in doctrinal or administrative disputes among members or branches of a church. Even if the Claimant had remained a parishioner of the Debtor, these decisions would be inapposite. There is no question here concerning different interpretations of doctrine, *see Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658, 1969, or of conflict in administrative matters. *See Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). This is a claim against a church alleging fraud and undue influence, not a claim concerning a church's proper direction. *See General Council on Finance & Administration v. California Superior Court,* 439 U.S. 1369, 1372–73, 99 S.Ct. 35, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice 1978); *Ambassador College v. Geotzke,* 675 F.2d 662, 665 (5th Cir.1982).

The Debtor contends that the First Amendment prohibits the proposed interrogation and other similar discovery requests even if the principles governing internecine church disputes do not apply. Its position is that the questions it objects to should be barred on free exercise grounds because they seek responses which consist of an expression of religious belief in the context of a claim which is largely based upon the mere expression of such beliefs. The Debtor concedes that the conduct of its representatives may be inquired into, but maintains that speech concerning religious matters is inviolate. It cites *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), for the oft-repeated proposition that the First Amendment embraces two concepts, freedom to believe and freedom to act. The court observed in *Cantwell* that freedom to believe is absolute, but freedom to act is not. *Cantwell,* 310 U.S. at 303–04, 60 S.Ct. at 903. The Debtor also draws parallels between the case at bar and *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). There, members of the so-called "I am" movement were convicted of mail fraud because of allegedly false representations concerning various religious tenets

such as, for example, the belief that the movement's leaders had the power to heal and in fact had healed individuals of diseases which are normally incurable. The trial judge limited the factual issue to the defendants' good faith belief in such statements. The Appeals Court reversed the conviction on procedural grounds, and ruled that the truth or falsity of the statements was the issue to be determined, not their good faith. The Supreme Court disagreed, holding that the First Amendment prohibits conviction for "false" religious views, stating in part: "Men may believe what they cannot prove." *Ballard,* 322 U.S. at 86, 64 S.Ct. at 886. The Court did not reach the question of whether the defendants' good faith could be put in issue, remanding the case to the Appeals Court for a resolution of this question and other issues.

The Claimant makes a number of responses. First, she asserts that *Ballard* has no application here because this claim is not based upon the falsity of religious statements. Rather, to the extent that religious statements may form any basis for her cause of action, such statements, says the Claimant, are relevant only because of the fact that they were made, not because of their truth or falsity. The Claimant also argues that insincere religious statements are actionable, pointing out that *Ballard* left that question open and citing decisions such as *Wisconsin v. Yoder,* 406 U.S. 205, 216, 235–36, 92 S.Ct. 1526, 1543, 32 L.Ed.2d 15 (1972), in which the Court placed emphasis upon the sincerity of religious beliefs in fashioning an exception to a state law requiring public education for children. Most importantly, the Claimant urges, responses to the types of questions here at issue must be viewed in the context of the entire pattern of conduct of the Debtor's representative, and when so viewed they constitute conduct which is not entitled to protection. The Claimant also cites a number of decisions of state courts permitting actions for undue influence against spiritual advisors and churches, all decided after the First Amendment was held applicable to the

states through the Fourteenth Amendment.[4] Finally, the Claimant argues that statements as to religious matters, even though there may be an issue of whether they are actionable in themselves, are still relevant to establish a fiduciary relationship, an important element in any undue influence case.

The Debtor's rejoinder to all of this seems to be based primarily upon what the Supreme Court left open in *Ballard*. The Debtor quotes from the dissent of Justice Jackson, who would have decided the sincerity issue. Justice Jackson believed that putting the sincerity of religious beliefs in issue was as objectionable as questioning their truth. *Ballard*, 322 U.S. 78, 92–95, 64 S.Ct. 882, 889–90, 88 L.Ed.2d 1148 (1944) (Jackson, J., dissenting). The Debtor contends that the same principle applies here; for the same reason that there is protection against criminal action based upon the expression of religious belief there is similar protection against civil action for undue influence and fraud grounded in whole or in part upon such statements. The Debtor cites *Molko v. Holy Spirit Association for the Unification of World Christianity*, 179 Cal.App.3d 450, 224 Cal.Rep. 817 (1986), a decision of the California Appeals Court which is currently on appeal to the California Supreme Court. In *Molko*, the court allowed summary judgment in favor of a church, thereby dismissing claims by two apostates based upon fraud, intentional infliction of emotional distress, false imprisonment, and the claim of one former member for restitution of a $6,000 gift allegedly procured through undue influence. The court viewed the restitution claim as an inquiry into the reasonableness of religious beliefs, an inquiry which the court believed was barred by the First Amendment.

We have related these opposing First Amendment arguments at some length because both parties have devoted their briefs to them. These substantive questions are not, however, properly before the Court at this juncture. We are not now concerned with either the merits of the claim or with the admissibility of evidence which the Claimant might present. The Debtor's motion is made pursuant to Bankruptcy Rule 7026, which is derived from Rule 26 of the Federal Rules of Civil Procedure. BANKR. R. 7026 permits discovery of any unprivileged matter "which is relevant to the subject matter involved in the pending action." The rule provides that inadmissibility at trial is not ground for objection if the information "appears reasonably calculated to lead to the discovery of admissible evidence."

Rule 26 can be boiled down to two basic issues: (1) is the matter privileged?; and (2) if not privileged, is the matter relevant to the subject matter of the pending action? The Debtor appears to assert that there is a First Amendment privilege which can be claimed at the discovery phase of litigation if the information sought to be discovered involves any religious belief, practice, or concern. It relies on the First Circuit opinion in *Surinach v. Pesquesa de Busquets*, 604 F.2d 73 (1st Cir.1979), in which the court refused to enforce a state subpeona ordering a Catholic Church to produce documents related to the financial practices of its parochial school system.

The Claimant responds that no First Amendment privilege applies here because the state is not a party to this litigation, and therefore discovery here cannot be viewed as the opening wedge in state regulation of religious activities. She cites *Ambassador College v. Geotzke*, 675 F.2d 662 (5th Cir.1982), *Pagano v. Hadley*, 100 F.R.D. 758 (D.Del.1984), and *In re Contemporary Mission, Inc.*, 44 B.R. 940 (Bankr. D.Conn.1984). All of these decisions rejected a First Amendment religious privilege in discovery when only private litigants are involved. She points out that the Debtor has cited no case to support its claim of privilege in this context, and argues that

---

4. *E.g. Gingrich v. Bradley*, 232 Ark. 884, 341 S.W.2d 33 (1960); *Tallahassee Bank & Trust Company v. Brooks*, 200 So.2d 251 (Fla.1967); *Hensley v. Stevens*, 156 Mont. 486, 481 P.2d 694 (1971); *Nelson v. Dodge*, 68 A.2d 51 (R.I.1949).

the only privilege available to the Debtor is the priest-penitent privilege contained in MASS.GEN.L. ch. 233, § 20A.

 Privilege, as contemplated by Rule 26, corresponds to the concept of privilege in the evidentiary rules. *United States v. Reynolds,* 345 U.S. 1, 6, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953); 4 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 26.-60[1] (2d ed. 1986) (hereinafter "MOORE"). Privileges can arise from the common law, state or federal statutes, or the Constitution. *See* MOORE, *supra,* ¶ 26.60[7]. A litigant, however, carries a heavy burden in attempting to establish a privilege: "Evidentiary privileges are not favored, and even those rooted in the Constitution must give way in proper circumstances ... '[w]hatever their origins, ... exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for the truth.'" *Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979) (quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108–3109, 41 L.Ed.2d 1039 (1974)).

The Debtor here has failed to carry that burden. Its reliance on *Surinach* is misplaced because, as the Claimant points out, this is civil litigation between private parties. There is no danger here that the government will unconstitutionally entangle itself in church affairs by seeking to monitor or regulate religious activity. *See Ambassador College v. Geotzke,* 675 F.2d 662, 664 (5th Cir.1982); *cf. United States v. Freedom Church,* 613 F.2d 316, 320 (1st Cir.1979). The state is not even a shadowy presence in this discovery; the information requested relates to a private, secular dispute between an individual and a religious organization in which the individual alleges fraud and undue influence by the organization.

A few courts have held that other freedoms under the First Amendment can create a privilege in discovery even in the context of a private suit without government involvement. In *Adolph Coors Co. v. Wallace,* 570 F.Supp. 202 (N.D.Cal.1983), a district court held that an associational First Amendment privilege operated to preclude the discovery of the names of a gay rights group's members, the group's sources of financial support, and its scope of activities. The court reasoned that the revelation of this information might chill the rights of the members of the group because it was possible that such a disclosure might lead to reprisals or harrassment, regardless of who requested the information. *Adolph Coors Co.,* 570 F.Supp. at 208–10. *See Black Panther Party v. Smith,* 661 F.2d 1243, 1264–70 (D.C.Cir. 1981), *vacated mem. sub. nom.,* 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1981). Similar concerns motived the court in *Grinnell Corp. v. Hackett,* 22 Fed.R. Serv.2d (Callaghan) 482 (D.R.I.1976), to bar the Teamster Union's discovery request of the membership lists of an employer's association which challenged a state's distribution of unemployment benefits to striking workers. Even though a private party had requested the lists, the court held that a privilege based on associational rights was appropriate because the apprehension of reprisals might discourage the members of the employer's association from exercising their First Amendment rights. *Grinnell Corp.,* 22 Fed.R.Serv.2d at 489. Finally, the First Circuit has held that a newspaper reporter's need to keep certain sources confidential raises First Amendment concerns in a private civil litigation. These concerns require "heightened sensitivity" by courts when applying Rule 26, and a balancing of both the need for information and the means of obtaining it against the consequences of compelling disclosure. *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 596–98 (1st Cir.1980).

The requests in these cases ignited apprehensions that revelation of the requested information might infringe upon the First Amendment freedoms involved. In *Adolph Coors Co.* and *Grinnell Corp.,* the courts believed that if the information was not kept private, other groups and individuals might use it to persecute members or contributors, thereby discouraging their in-

clination to associate with the group. In *Bruno & Stillman,* the First Circuit was concerned that potential news sources for reporters might be fearful of providing reporters with important information if their names were likely to be revealed, thereby resulting in an inhibition of freedom of the press to obtain information and freely disseminate news.

■ In this case, however, revelation to the Claimant of the Debtor's beliefs, or revelation by the Debtor of any information with religious overtones, will not inhibit or "chill" its members' freedom to exercise their religion. The Debtor characterizes itself as an evangelical church. It regularly informs others of its members' religious beliefs through sermons open to the public, as well as through television and radio programs. It seeks to keep its religious beliefs private only for the purposes of this litigation. The Debtor cannot, however, use the First Amendment as a preemptive strike. It must first establish that its need for protection outweighs the Claimant's need for information. It has not shown the Court how its First Amendment rights would be diminished by revelation. The discovery in this case does not involve the real danger to First Amendment religious freedom—excessive government entanglement in religious affairs or in the evaluation of religious beliefs. *See Ambassador College v. Geotzke,* 675 F.2d 662, 663–65 (5th Cir.1982); *Pagano v. Hadley,* 100 F.R.D. 758, 761 (D.Del.1984); *In re Contemporary Missions, Inc.,* 44 B.R. 940, 942–43 (Bankr.D.Conn.1984). *See also General Council on Finance & Administration v. California Superior Court,* 439 U.S. 1369, 1372–73, 99 S.Ct. 35, 38, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice, 1978) (danger of state entanglement in essentially religious disputes is not present in purely secular disputes where fraud is alleged). We therefore conclude that there is no First Amendment privilege based upon religious freedom in the context of discovery in this private civil litigation.

The questions to which the Debtor objects are clearly relevant to the subject matter of this claim. They seek to elicit the content of discussion between the Claimant and representatives of the Debtor. The claims here of fraud and undue influence are apparently largely, if not entirely, based upon such discussions. Moreover, relevance is liberally construed for discovery purposes. Its scope is broader than that of the evidentiary principle of relevance, which generally confines evidence to that which tends to support or negate a cause of action. *Spell v. McDonald,* 591 F.Supp. 1090, 1114 (E.D.N.C. 1984); *see* FED.R.EVID. 401. We do not interpret Federal Rule 26(b)(1) as narrowing the definition of relevance to only information that is either admissible or will likely lead to admissible information. Relevancy as to subject matter remains the overriding requirement under Rule 26. *See Alliance to End Repression v. Rochford,* 75 F.R.D. 441, 444 (N.D.Ill.1977).

■ Here it is important for the Claimant to have the entire content of these conversations, even including portions which arguably do not (or legally cannot) show fraud or undue influence, in order to assess the significance of an entire conversations or any portion thereof. If relevant to the subject matter, information which is useful in preparation for trial may be discovered. *Smith v. Schlesinger,* 513 F.2d 462, 473 (D.C.Cir.1975); *Alliance to End Repression v. Rochford,* 75 F.R.D. 441, 444 (N.D.Ill.1977); *see Felix A. Thillet, Inc. v. Kelly Springfield Tire Co.,* 41 F.R.D. 55, 57–58 (D.P.R.1966); FED.R.CIV.PRO. 26(b)(1) 1946 advisory committee note. *But see Smedley v. Traveler's Insurance Co.,* 53 F.R.D. 591 (D.N.H.1971) (requiring information to be either admissible or calculated to lead to admissible evidence in addition to being relevant). We do not mean to imply that any of the information which the Claimant seeks will or will not be admissible, or will or will not likely lead to admissible evidence. We need not determine that issue here. *Felix A. Thillet, Inc. v. Kelly Springfield Tire Co.,* 41 F.R.D. 55, 57 (D.P.R.1966). A liberal interpretation of relevance in this case will aid in helping the

parties obtain admissible evidence. It will also narrow and crystalize issues in preparation for trial.

The Debtor also objects to several of the Claimant's possible inquiries on the ground that they are designed to discover information which the Claimant already has. Even if parties seeking discovery already have the information sought, they are entitled to their opponent's version in order to know what will be contested at trial. *See* MOORE, *supra,* ¶ 26.59. Nor do we see merit to the Debtor's objection to discovery of conversations about religion among church members, so long as such conversations are relevant to the subject matter.

The Court is cognizant, however, of its obligations under Rule 26(b)(1) and 26(c) to protect parties and others from annoyance, embarrassment, oppression, or undue burden or expense. The questions objected to by the Debtor have not yet been asked in this litigation, and thus our ruling today is somewhat in the abstract. We caution both the Claimant and the Debtor not to read this opinion too broadly. We remain ready to issue protective orders and to impose sanctions if discovery, or objection to discovery, is used to harass, annoy, embarrass, or run up expenses. Discovery should be employed to uncover relevant information and to refine issues for trial. By a previous pretrial order, the Court has limited the time for discovery with these objectives in mind, and the Court intends to keep the parties to the schedule set forth in that pretrial order.

The motion is accordingly DENIED.

SO ORDERED.