HOWARD M. CULLUM, COMMISSIONER, ETC.

V.

FAITH MISSION HOME, INC., ET AL.

Record Nos. 861000 and 870271

April 21, 1989

Present: All the Justices

*R. Claire Guthrie, Deputy Attorney General (Mary Sue Terry, Attorney General; Roger L. Chaffe, Senior Assistant Attorney General; Frank W. Pedrotty, Assistant Attorney General; Jane D. Hickey, Assistant Attorney General*, on briefs), for appellant.

*John C. Lowe (Lowe & Jacobs, Ltd.*, on brief), for appellees.

*Amici Curiae:* American Civil Liberties Union of Virginia (Stephen W. Bricker; Susan L. Quig-Terry; Susan F. Stefan; Leonard S. Rubenstein; Bremner, Baber & Janus, on brief), for appellant.

The Association for Retarded Citizens/Virginia (Alexander Weir, III, on brief), for appellant.

CARRICO, C.J., delivered the opinion of the Court.

These appeals involve the Faith Mission Home (the Home), a project of the Beachy Amish Mennonite Church. Located on property partly in Albemarle County and partly in Greene County, the Home was licensed in June 1973 by the Virginia Department of Mental Health and Mental Retardation (the Department)[1] as a residential facility for the care and treatment of mentally retarded children and adults. At the time of trial below, none of the Home's residents was Amish.

Church members staff the Home as part of their Christian mission and, in accordance with the religious precepts of the church, use physical punishment under controlled conditions in limited situations to discipline residents for maladaptive behavior. The punishment takes the form of slapping the hand several times or spanking the buttocks a maximum of four strokes with the hand or a "simple light paddle."

After two years of study, the Department and other interested state agencies promulgated what they termed the "CORE" standards, applicable to the licensure and regulation of residential facilities for children in the Commonwealth. Purporting to prohibit the use of all physical punishment in such facilities, the standards became effective July 1, 1981.

Contending that "to comply with the [CORE standards] would be a violation of [its] religious beliefs and practices," the Home did not apply for renewal of its license in 1981 and requested an exemption from licensure. On May 24, 1982, the Department denied the request in a letter ruling signed by its Commissioner, Joseph J. Bevilacqua. The Home then secured a provisional license and later an annual license.

On September 2, 1985, a twenty-one year old female resident of the Home was admitted to a Charlottesville hospital suffering from seizures. In addition to the seizures, she was found to have multiple bruises on her buttocks. An investigation revealed that she had been spanked with a paddle by a child-care supervisor at the Home because the supervisor thought she was "faking seizures." The supervisor was dismissed as a result of the incident.

---

[1] Effective July 1, 1987, the name of the Department of Mental Health and Mental Retardation was changed to the Department of Mental Health, Mental Retardation, and Substance Abuse Services.

The incident was reported to the Department, and, on September 10, 1985, Commissioner Bevilacqua[2] instituted the present proceeding by filing a petition seeking to enjoin the Home from administering "any and all types of corporal punishment" at the facility. The trial court awarded the Commissioner a temporary injunction, effective until October 16, 1985, prohibiting "the use of corporal punishment or any other type of physical punishment as a form of disciplining the mentally retarded residents of Faith Mission Home facility."

At the same time, the court appointed guardians ad litem to monitor compliance with the temporary injunction. A consent order was entered on October 16, 1985, continuing the injunction in force indefinitely.

The Home's license for 1986 was due to expire on May 31 of that year. In applying for a renewal, the Home requested a variance from the CORE standards' purported prohibition against corporal punishment. The Department denied the request. Then, on May 16, 1986, the Home filed in the present proceeding a petition "for a review and reconsideration of [the] consent order."

The petition alleged that because certain residents had become uncontrollable in the absence of "appropriate and effective standards for enforcing discipline," the Home could not continue to operate under the restrictions imposed by the consent order. The petition prayed that the rules promulgated by the Commissioner concerning the use of corporal punishment be declared unconstitutional as violative of the free exercise of religion clause of the First Amendment to the Constitution of the United States and that the Home be permitted to discipline residents according to the religious precepts of the Beachy Amish Mennonite Church.

On June 19, 1986, parents of children under treatment at the Home filed a petition asking that the parents and children be permitted to intervene in the present proceeding. The petition alleged that the parents had "an absolute right . . . to administer physical punishment, including spanking, to their own children within appropriate limits as necessary to treat, train, socialize and discipline them [and] also . . . the right to delegate this function to others without interference from the state, so long as the actions are administered reasonably and safely."

[2] Howard M. Cullum is the present Commissioner, and he has been substituted as the petitioner in this proceeding in place of Joseph J. Bevilacqua.

In late June and early July of 1986, the trial court conducted a hearing on the May 16 and June 19 petitions. On July 16, 1986, the court entered an order permitting the parents and the children to intervene as respondents.[3] In the order, the court also found that "[u]nder very limited situations, physical punishment is an indispensable and effective treatment for behavior management of mentally retarded children and adults." The court further found that the "statutes and regulations of the Commonwealth of Virginia do not prohibit the therapeutic use of physical punishment in the behavior management of mentally retarded children and adults." The court enjoined the Home, however, from "using any form of physical punishment prior to October 16, 1986, unless [the] injunction is sooner dissolved." The court declined to rule "at [that] time on the religious freedom and other issues raised by the Respondents."

On October 16, 1986, the Home moved for entry of an order holding it exempt under the provisions of Code § 37.1-188. The trial court heard the motion and, on February 17, 1987, entered the final order in the case.[4] In this order, which incorporated a written opinion, the court denied all relief requested by the Commissioner, held that Code § 37.1-188 exempted the Home from licensure, and found that the Commonwealth had no compelling interest in licensing the Home. The court ruled there was "no evidence of a threat of irreparable harm to the residents of [the Home]" because "there are . . . adequate remedies [other than an injunction] available to assure the health, safety and welfare of the residents" and refused to enter "any injunction pending appeal."

The Commissioner assigns error to the several adverse rulings of the trial court. In our opinion, however, the dispositive question is whether the court correctly held that Code § 37.1-188 exempts the Home from licensure.

Section 37.1-188 is part of Chapter 8 of Title 37.1 of the Code. Section 37.1-183.1, also part of Chapter 8, provides that "[n]o person shall establish, conduct, maintain or operate in this Commonwealth any facility or institution . . . for the care or treatment of mentally ill or mentally retarded persons . . . without

---

[3] The July 16, 1986 order is the subject of the appeal in Record No. 861000.

[4] The February 17, 1987 order is the subject of the appeal in Record No. 870271.

first being duly licensed under this chapter, except where such facility or institution is exempt from licensing."

Code § 37.1-188 provides an exemption. It reads:

> Nothing in this chapter contained shall be construed to authorize or require a license of a person to establish, maintain, and operate, or to have charge of, any institution, hospital or home for the care or treatment of persons by the practice of the religious tenets of any church in the ministration to the sick and suffering by mental or spiritual means without the use of any drug or material remedy, whether gratuitously or for compensation, provided the statutes and regulations on sanitation are complied with.

On the subject of exemption, the trial court said in its written opinion:

> The question of exemption under 37.1-188 is one of statutory interpretation. To be exempt, an organization must minister to the sick or suffering using mental or spiritual means, without the use of any drugs or material remedies. Upon consideration of the evidence, the court holds that [the Home] is exempt from any licensing requirements under 37.1-188 because it is ministering to the sick or suffering by the use of spiritual means and is not using 'any drug or material remedy.'

Challenging this holding, the Commissioner says the trial court found as a matter of fact that the Home engaged in such secular activities as administering physical punishment, administering drugs prescribed by physicians, administering vitamins without prescription,[5] and using behavior modification techniques and other physical measures. Yet, the Commissioner asserts, the trial court held that because these activities were spiritually motivated by sincerely held religious beliefs, they qualified as "spiritual means," entitling the Home to exemption from licensure. This

---

[5] The testimony of a witness for the Home shows that some children are given vitamins "as a supplement" because they "don't chew" properly and do not use their food "to its highest potential."

holding, the Commissioner complains, "has eliminated all regulation of the care and treatment provided at [the Home]."

The Commissioner argues that there is no basis in law or in fact for the trial court's holding. Code § 37.1-188, the Commissioner says, contrasts the words, "mental or spiritual means," with the words, "without the use of any drug or material remedy." These words are not statutorily defined, the Commissioner states, and, hence, must be given their ordinary meaning. The Commissioner points out that in *Webster's New Collegiate Dictionary* (1981), the word "spiritual" is defined as meaning "of, relating to, or consisting of spirit : INCORPOREAL," *id.* at 1113, while the word "material" is defined to mean "relating to, derived from, or consisting of matter; *esp* : PHYSICAL," *id.* at 702. The Commissioner then argues:

> It would seem axiomatic, therefore, that the 'mental or spiritual means' referred to in the statute are those that do not utilize *any* material or physical means, including the administration of drugs as well as other material or physical activities, such as physical punishment, behavior modification techniques, operant conditioning, neurological and sensorimotor training, and physical [and] speech therapy, which may endanger the well-being of the mentally retarded residents if used inappropriately.

(Emphasis in original.)[6]

The Commissioner does not question that the Home's care or treatment of its residents is "by the practice of the religious tenets of [the Beachy Amish Mennonite Church]." The Commissioner maintains, however, that the Home's ministration to the sick or suffering is not by "spiritual means" and not "without the use of

---

[6] Citing his 1982 denial of the Home's request for an exemption under Code § 37.1-188, the Commissioner argues further that we should observe the rule that the construction given a statute or regulation by the public official charged with its administration is entitled to "great weight." We do not know, however, what construction the Commissioner gave Code § 37.1-188. He did not testify below, and the trial court admitted his letter ruling only for the purpose of showing that the Home's request for an exemption had been denied. Because we do not know what construction the Commissioner gave the statute, we cannot determine the validity of his further argument that the General Assembly has acquiesced in his construction by failing to enact legislation contrary to the construction.

any drug or material remedy," within the intendment of Code § 37.1-188.

Reduced to essentials, it is the Commissioner's position that because all the Home's activities are secular or physical, nothing it does is spiritual and, hence everything it does is material, thus disqualifying the Home under the "material remedy" exception to the exemption provided by Code § 37.1-188. And, on the subject of drugs, the Commissioner says that the use of *any* drug, for whatever purpose prescribed or administered, disqualifies the Home under the "drug" exception to exemption.

■ We disagree with the Commissioner. In the first place, it would be difficult, if not impossible, to envision the "institution, hospital or home," Code § 37.1-188, that would not use *"any* material or physical means" to treat the unfortunate people needing care.[7] Indeed, in the Commissioner's view, merely providing the basic necessities of food, bedding, and shelter to those in residential facilities would constitute ministering to the sick or suffering by "material or physical means," and even giving the residents vitamins as a food supplement would constitute "the use of any drug." We doubt that the General Assembly intended so restrictive an interpretation of the provisions of Code § 37.1-188.

Be that as it may, we must determine whether the trial court correctly held that the Home "is ministering to the sick or suffering by the use of spiritual means" or whether the ministrations constitute "material remedies" instead. As noted previously, the Commissioner relies upon a dictionary definition of the word "spiritual" as meaning "of, relating to, or consisting of spirit : INCORPOREAL." *Webster's New Collegiate Dictionary* 1113 (1981). The statutory language with which we are concerned, however, does not consist of the word "spiritual" alone; the language is "spiritual *means,"* which denotes something more than mere relationship to the spirit. The language denotes not only spiritual beliefs but also the ways in which such beliefs may be implemented.

---

[7] The Commissioner says on brief that members of the Church of Christ Scientist practice their faith without the use of any material or physical means. There is nothing in the record to support this view. But if this church should operate an institution, a hospital, or a home for the mentally retarded, it would be compelled to provide the basic necessities of food, bedding, and shelter and thus disqualify itself for exemption under the Commissioner's strict interpretation of Code § 37.1-188.

The noun "mean" is defined in *Webster's Third New International Dictionary* 1398 (1981) as "something by the use or help of which a desired end is attained or made more likely: an agent, tool, device, measure, plan, or policy for accomplishing or furthering a purpose." Admittedly, this definition relates to secular things. But the members of the Beachy Amish Mennonite Church, as a matter of faith, believe that each act they perform in caring for or treating the residents of the Home is spiritual. In "A STATEMENT OF FAITH," introduced as an exhibit below, we find this declaration:

> Members of the Beachy Amish Mennonite Church sincerely and conscientiously hold the following to be a matter of their religious faith:
>
>  . . . .
>
> In our ministry to the needy, we must use some of the techniques commonly considered to be secular, such as providing food, clothing, and shelter, various forms of physical therapy, accepted practices of financial management, and the discipline of children. These techniques are used only as they complement the scriptural mandates . . . .
>
>  . . . .
>
> Therefore, all of our ministry to the needy is done in the name of Christ and to His glory, and such commonly-considered-secular techniques are spiritual means of caring for the residents, as these techniques are given to the residents at Faith Mission Home.

Witnesses for the Home vouchsafed these beliefs in every respect. For example, Ivan R. Beachy, a minister of the Beachy Amish Mennonite Church and assistant administrator of the Home, testified that each activity of the Home from "[i]ndividual treatment plans and goal setting" through "[b]ehavioral modification program[s]" to "neurological and sensorimotor training" was "within the spiritual means under [the Home's] Statement of Faith."

The Commissioner concedes the sincerity of the Home's operators in their belief that all their activities in caring for or treating the residents are spiritual. The Commissioner maintains, however, that the concession does not end our inquiry. He says that the Home cannot be the sole arbiter of what activities are spiritual

and what are material. We agree. *United States* v. *Ballard*, 322 U.S. 78, 86 (1944); *Cantwell* v. *Connecticut*, 310 U.S. 296, 303-04 (1940). "[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin* v. *Yoder*, 406 U.S. 205, 215-16 (1972).

■ But in determining the quality of the claims of those espousing a particular religious belief, the court "must be careful to determine whether [their] faith and their mode of life are . . . inseparable and interdependent." *Id.* at 215. And once it is found that faith and mode of life are inseparable and interdependent, as they are in this case, the spirituality of the activities in question is established. Accordingly, we hold that the trial court was correct in ruling that the Home "is ministering to the sick or suffering by the use of spiritual means" without the use of "material remedy."

This leaves the question whether the Home's "ministration to the sick and suffering [is] without the use of any drug." The evidence shows that no physician is attached to the staff of the Home but that certain drugs are administered by staff members upon the prescription of outside physicians for conditions such as epilepsy and diabetes, from which some of the residents suffer in addition to their mental retardation. An exhibit introduced by the Home, however, shows that in its care or treatment of mental retardation, "[n]o medications are used in [the] treatment program."

Testimony from witnesses for the Home supports the statement made in the exhibit. This testimony shows that when new residents arrive at the Home on medication prescribed to control their behavior, the Home "trie[s] to reverse that situation and get them off the medicine and tr[ies] to [use] other means of control." From one-third to one-half of the new residents are "on some type of behavior modification drug" when they arrive, but they "are completely removed within a reasonable length of time," and no physician thereafter prescribes "any drug for any [resident] which [is] intended to treat mental retardation."

■ We think that under any reasonable interpretation of Code § 37.1-188, any institution, hospital, or home for the care or treatment of mentally retarded persons is qualified for exemption if it treats its residents without drugs for the condition for which it exists, *viz.,* mental retardation, even though some drugs are administered, provided the drugs are prescribed for other conditions by outside physicians. The Home qualifies under this interpreta-

tion and is entitled to the exemption provided by Code § 37.1-188.

Having decided that the Home is exempt from licensure, we do not reach, and express no opinion upon, the constitutional and other issues involved in this case. The judgment of the trial court will be affirmed.

*Affirmed.*